**COMPUTING SCALE CO. v. TOLEDO COMPUTING SCALE CO.***

**TOLEDO COMPUTING SCALE CO. v. COMPUTING SCALE CO.**

(Circuit Court of Appeals, Seventh Circuit.   October 4, 1921.)

Nos. 2777, 2784.

I. **Property ⚖️1, 7—Classified and right in property stated.**

Property may be classified as real, personal, or mixed, and as tangible or intangible; but the right in property is the same as to all classes, and consists only of the right to exclude others.

2. **Patents ⚖️312(1)—All doubts resolved against willful infringer not keeping separate and accurate records.**

If a manufacturer, knowing of a patent, decides to chance an unlicensed use, he will be held to the duty of keeping separate and accurate records of all his infringing acts, and on his failure to keep such records all doubts should be resolved against him.

3. **Patents ⚖️312(1)—Complainant should accept statement of profits from proper records, unless he alleges and proves that it is false, or not adequate measure of damages.**

When an infringer states his profits from proper records kept by him, the complainant should be compelled to accept such statement as a measure of his money decree, unless he is prepared forthwith to allege and prove that the account was falsely stated, or that the profits, if truly stated, are not an adequate measure of his damages.

4 **Patents ⚖️322—When defendant's account of profits shown false, court may appoint accountant, whose report should stand, unless impeached for fraud or gross inaccuracy.**

If an account of profits made by an infringer from his records is shown to be false, the chancellor, directly or through the master, may well appoint a competent and disinterested accountant, and his report should stand, unless promptly impeached for fraud or gross inaccuracy.

5. **Patents ⚖️312(1)—Complainant, alleging profits not adequate measure of damages, may be required to prove value of property appropriated by testimony of experts.**

If the patentee takes the ground that an infringer's profits are not an adequate measure of his damages from infringement, he may well be required to prove the value of the appropriated property, as other such issues are tried, by the opinion testimony of experts qualified to speak of the value of the invention.

6. **Patents ⚖️319(1)—Royalties not measure of value of property appropriated by infringer.**

Where an infringer's profits are not an adequate measure of the patentee's damages, neither established royalty nor reasonable royalty is necessarily the value of the appropriated property, as an infringer should not be allowed the profit which a licensee justly expects.

7. **Patents ⚖️322—Infringer may be required to allege in account grounds on which he claims apportionment and limited to such averments.**

If an infringer satisfactorily states his profits from the infringing device, but contends that only a part is attributable to the invention, he may be required to allege in his account, taken as a verified pleading, the grounds on which he claims apportionment of profits, and his proof should be limited to such averments.

8. **Patents ⚖️324(5)—Decree on the merits held final, and not reviewable on appeal from money decree rendered after accounting.**

Where a decree for complainant in a patent infringement suit was reversed for insufficient proof of complainant's title, and the District Court,

---

⚖️For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
*Certiorari denied 257 U. S. —, 42 Sup. Ct. 184, 66 L. Ed. —.  See, also, 281 Fed. —.

having found good title, re-entered the original decree in 1914, such decree was final in its essence, and, not having been appealed from, could not be attacked on appeal from a money decree rendered in March, 1919, after an accounting.

9. **Patents ⬤⟳324(5)—Decree not reversed for insufficient proof of title, when statute of limitations protects defendant against claim by any one else.**

Where complainant was in the open, notorious, adverse, exclusive, and continuous possession of a patent franchise during the infringing period, and the patent expired in 1912, so that the statute of limitations protects defendant from liability to third parties for the infringement, a judgment for complainant will not be reversed for insufficient proof of its title to the patent.

10. **Corporations ⬤⟳398(3)—Assignment of patent by all stockholders conveyed equitable title.**

An assignment of a patent in the name and on behalf of a corporation by all of its stockholders conveyed at least a full equitable title.

11. **Equity ⬤⟳452—When petition in nature of bill of review denied in 1913, insistence to same effect on subsequent appeal denied for delay.**

Where a petition in the nature of a bill of review to open a patent infringement decree to let in further proof of anticipation was denied in 1913, the insistence on appeal from a money decree rendered in March 1919, that the denial of such petition should be reversed, the decrees upholding the patent reversed and the bill dismissed, if regarded as in the nature of a bill of review, appealing to equitable discretion, will be denied for delay.

12. **Patents ⬤⟳322—That profits as found exceed profits of infringer's entire business not conclusive of error.**

That an infringer's profits on the sale of infringing scales, as found by the master, exceed the profits of its entire business during the infringing period, is not conclusive of error by the master, as profits from the infringing branch of the business cannot be applied to cover losses on a noninfringing branch.

13. **Patents ⬤⟳322—Under patents specifying light material, whether material was sufficiently light to be settled at hearing on merits and not on accounting.**

In a suit for infringement of claims of a patent covering a cylinder frame for automatic computing scales of light material, or of aluminum, whether steel was sufficiently light to secure the benefits of the invention was a question to be threshed out and settled at the final hearing on the merits, as distinguished from the accounting.

14. **Patents ⬤⟳328—Reissue No. 11,536, for cylinder frame for scale, infringed by use of steel spider.**

The Smith reissue patent, No. 11,536, for a cylinder frame of light material for automatic computing scale, *held* infringed by scales in which the spider of the cylinder was made of steel.

15. **Patents ⬤⟳322—Infringer not filing proper account held in default.**

An infringer, not complying with equity rule 63 by filing an account showing its profits, and filing instead an account which was false in part, and covered only a small part of the accounting period, was in default, and the default was not canceled by the fact that complainant and the master took it on themselves to state the account.

16. **Patents ⬤⟳322—Infringer's default in filing account held not cured by report of other accountants.**

Where an infringer filed an account prepared by its auditor, covering only part of the accounting period, and the complainant accepted his figures on certain elements of cost, and employed accountants to examine the infringer's records and report other necessary elements, and defendant then employed accountants, who confined their examination to a part of the period covered by the auditor, and attempted to reform the books by

⬤⟳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

making calculations based on figures that in their opinion should have been entered, defendant's default *held* not cured thereby.

17. **Patents ⟨⟩322—When calculations by accountants waived on the hearing, the matter could not be reinstated by employment of different counsel.**

Where calculations by accountants employed by defendant to show errors in accounts prepared by its own auditor and by plaintiff's accountants were practically abandoned on the hearing before the master, and the figures disclosed in an exhibit prepared by plaintiff's accountants, as corrected on the hearing, were in the main acquiesced in, the employment of new or additional counsel could not reinstate the matter that had been waived in open court.

18. **Patents ⟨⟩318(6)—Infringer not entitled to deduct expenses of litigation with patentee as part of cost.**

On a patent infringement accounting, the infringer was not entitled to include in the cost of the infringing devices the expenses of its litigation with the patentee.

19. **Patents ⟨⟩318(6)—Cost of infringer's experimental department not deducted as part of cost.**

On a patent infringement accounting, the infringer was not entitled to include in the cost of the infringing devices the expense of maintaining an experimental department, where it was not shown that any of the expenses were incurred on account of the infringing scales, or had anything to do with them.

20. **Patents ⟨⟩318(6)—Infringer not entitled to deduct cost of obtaining patents as part of cost.**

On a patent infringement accounting, defendant *held* not entitled to include in the cost of the infringing devices expenses of obtaining patents in this and other countries.

21. **Patents ⟨⟩322—Master not required to substitute guesswork for proof of cost.**

On a patent infringement accounting, where the evidence did not show the infringer's right to include certain items in the cost of the infringing scales, the master was not compelled to substitute guesswork for proof.

22. **Patents ⟨⟩318(4)—Profits on infringing scales held all due to use of infringing feature.**

The equal cost of defendant's infringing and noninfringing scales, and the diminishing prices for noninfringing scales and increasing prices for the infringing scales, *held* to demonstrate that the features common to the two types created no part of the profits on the infringing scales, but that all were due to the patented cylinder, especially in view of defendant's failure to maintain any sort of cost accounting system and its commingling of the two businesses.

23. **Patents ⟨⟩318(5)—Interest on investment held properly apportioned according to relative volume of infringing and noninfringing business.**

On a patent infringement accounting, interest on the infringer's investment, being really the value of the use of its manufacturing plant and selling facilities in making and selling the infringing scales, was properly apportioned by the master between the infringing and noninfringing business of defendant according to the relative volumes of each business.

24. **Patents ⟨⟩259—Manufacturer of parts shipped to Canada and used in infringing devices not contributory infringer.**

Where defendant made in the United States and shipped to Canada parts, there assembled into completed scales, including the patented cylinder, and there delivered to Canadian users, but no completed scale or completed cylinder was ever shipped to Canada, defendant was not liable as a contributory infringing maker of such scales, as there must be a completed infringement in this country to which a contribution can be made.

⟨⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**25. Patents ⊜259—Approval in United States of orders received and filled in Canada not infringement of United States' patent.**

Where orders for scales containing the patented cylinder were received and filled at defendant's Canadian plant, but were not filled until the orders were approved at defendant's office in the United States, it did not, by approving the orders, become liable as an infringing seller in the United States.

**26. Patents ⊜318(3)—Infringer, accepting secondhand scales in part payment, only required to account for amount received.**

Where an infringer sold infringing scales at a fixed price, but sometimes accepted secondhand scales in part payment, it was only required to account for the amount received in cash and the amount received on resale of the secondhand scales, and not for the fixed price in money.

**27. Patents ⊜322—Master held not required to speculate as to potential profits on scales on hand when patent expired.**

Where the proofs on a patent infringement accounting proceeded on the basis that complainant's damages would be satisfied by an award of defendant's profits, and complainant did not prove the market conditions after the expiration of the patent, or what defendant did with the infringing scales on hand when the patent expired, the master was not required to speculate concerning potential or prospective profits on such scales.

**28. Patents ⊜319(1)—Complainant not entitled to damages because infringements gave infringer going business on expiration of patent without showing damages.**

Though the patent expired during the period of infringement, and the infringer by reason of the infringement obtained an advantage with respect to business after the expiration of the patent, where there was no evidence on which to assess the patentee's damages in this respect, they could not be recovered.

**29. Patents ⊜322—Accounting held not to be opened to permit complainant to show damages respecting certain matters.**

An accounting for infringement of a patent issued in 1895 *held* not to be opened, where substantial justice had been done, to permit complainant to show damages with respect to infringing scales on hand when the patent expired, or with respect to the good will of the business built up by reason of the infringement, where it would be necessary to open the case as to both parties, and defendant might be able to make a showing offsetting the damages which plaintiff desired to show.

Appeal and Cross-Appeal from the District Court of the United States for the Eastern Division of the Northern District of Illinois.

Suit for infringement of a patent by the Computing Scale Company against the Toledo Computing Scale Company. From a decree rendered for complainant after an accounting, the parties separately appeal. Affirmed.

In Toledo Computing Scale Co. v. Computing Scale Co., 208 Fed. 410, 125 C. C. A. 622, appellee's bill was based on claims 5 and 6 of reissue patent 11,536 and on patent 597,300, and the District Court sustained both patents and entered a decree of injunction and an order of accounting for profits and damages. On appeal we held that patent 597,300 was void, and that reissue 11,536 was valid and infringed, but that there was imperfect proof of complainant's title to that patent. We accordingly reversed the decree and remanded the cause, with directions to dismiss the bill as to patent 597,300, and "to permit complainant to introduce proof of title to reissue 11,536." On the remandment the District Court found that complainant had good title to reissue 11,536, and thereafter, on May 4, 1914, re-entered the origi-

nal decree as to that patent, except that, the patent having expired in the meantime, the command to cease infringing was omitted.

Both parties are now appealing from a decree that confirms the master's report on the accounting and directs defendant to pay complainant $404,101,-97, with interest from the filing of the report, and defendant's first content on is that the present money decree of March 5, 1919, and the merits decree of May 4, 1914, should both be reversed, with the direction to dismiss the bill for insufficient proofs of title.

In our findings of fact respecting the merits of reissue 11,536, we rejected the Phinney patent, 106,869, issued in 1870, as an alleged anticipation. Subsequently defendant filed in this court a petition in the nature of a bill of review to open the decree, in order to let defendant prove that Phinney had done more for the art in commercial practice than he had disclosed in his patent. This petition we denied, because defendant by the exercise of reasonable diligence could easily have brought the alleged new facts into the original hearing of the merits.

Defendant now insists that, on its proofs offered to the master and embodied in the record concerning Phinney's commercial practice, we should reverse our denial of the petition to reopen the case on the merits, should reverse our decree of 1913, and should reverse the District Court's decrees of 1914 and 1919, with the direction to dismiss the bill.

Alleged errors of the master against defendant are thus specified in the principal brief:

"His award to the plaintiff, as the profits derived by the defendant from the manufacture and sale of its infringing scales, constituting less than one-half of its entire business during the infringing period, of a sum approximating four times the amount of profits which it made on its entire business during said period.

"His failure to apportion, or to make any effort to apportion. the profits which he held to have been derived by defendant from the manufacture and sale of the infringing scales between the patented feature of the scale, constituting but a single element of it, and the remainder of the scale.

"His failure to give any consideration to the fact that except in respect to its employment of the light cylinder or drum defendant's scale was of a radically different type from the patented scale, and embodied numerous valuable and patented improvements, the property of the defendant, which it had acquired at great expense, and which contributed largely to the utility and salability of its scales.

"His award to plaintiff of the entire profits which he held to have been derived by defendant from its manufacture and sale of the infringing scales, including clearly and readily segregable profits derived from wholly independent attachments, such as the automatic electric lighting device.

"His award to plaintiff of the entire profits which he found to have been made by defendant, not only upon its cylinder scales employing cylinders or drums having skeleton frames made "of light material," as required by the claims of the patent in suit, but its scales employing cylinders or drums having their skeleton frames made of steel, one of the heaviest of materials.

"His refusal to consider the several standards of comparison presented by the record, and to award to plaintiff merely the profits derived by defendant from the manufacture and sale of scales employing the cylinders or drums which it did employ as compared with the profits which it would have made by employing other cylinders or drums, open and free for its use, and capable of serving the same purpose."

Complainant's assignments of error go to the master's allowance of interest on defendant's investment; this disallowance of defendant's profits on Canadian sales; his refusal to charge defendant with the full nominal selling price when secondhand scales were taken as part payment, and his charging defendant with only the cash received for new scales plus the amounts realized from secondhand scales; his refusal to include in the accounting of profits the scales on hand but unsold at the end of the accounting period; and his refusal to allow anything against defendant for the good will of defendant's business as it stood at the end of the accounting period.

As a basis for considering these assignments and cross-assignments of error, we set out the master's very full and painstaking report:

## Findings of Fact.

### Description of the Parties and the Business of the Toledo Scale Company.

The plaintiff, Computing Scale Company, the owner of reissued letters patent No. 11,536, the patent in suit, is a corporation engaged in the business of manufacturing and selling computing scales under said reissued patent at Dayton, Ohio, and is sometimes referred to as the Dayton Company.

The defendant, Toledo Computing Scale Company, now the Toledo Scale Company, hereinafter called the Toledo Company, is a corporation engaged in the business of manufacturing and selling computing scales at Toledo, Ohio, and in the course of its business infringed claims 5 and 6 of the patent in suit, as held by the Circuit Court of Appeals of this circuit in Toledo Computing Scale Co. v. Computing Scale Co., reported in 208 Fed. 410, 125 C. C. A. 622.

The infringing or accounting period begins about the 1st day of October, 1906, when the defendant began making and selling the infringing scale, and ends on the 3d day of September, 1912, when the patent expired.

When the Toledo Company began to manufacture and sell infringing scales, hereinafter called "cylinder scales," it was conducting a large, well-established business in manufacturing and selling computing pendulum fan scales. The fan scale shows weight and value by means of an indicator index hand carrying prices per pound moving back and forth across a fan-shaped dial, carrying on its face value and weight graduations. At this time defendant had its factory at Toledo and a built-up organization for making and selling fan scales, and after it began to make and sell the infringing scale it continued in the same factory under the same organization to manufacture and sell both fan and cylinder scales.

The fan scale and cylinder scale business were carried on as a single business. The material used in manufacture of fan scales and cylinder scales was drawn from the same stock. The same men worked on both kinds of scales. The same salesmen sold both kinds of scales. The overhead expenses applied to both kinds of scales. The books of account and records of the company were not kept with a view to separate costs, expense, or profits as between the two kinds of scales made and sold. Obviously the cost of making and selling cylinder scales cannot be accurately determined, but by making use of percentages and apportionments costs and profits may be found with reasonable certainty.

Salesmen of the Toledo Company in making sales sometimes accepted secondhand scales from customers in part payment of the purchase price on sales of cylinder scales. Until in 1909 these allowances were carried in one account as "Exchange Scales." From the beginning of 1909 there were two accounts "Toledo Scale Allowances" and "Exchange Scales." Toledo scale allowances were scales of defendant's own make taken in part payment in exchange. Exchange scales were scales of other makes taken in part payment in exchange. The plaintiff claims that in this accounting the defendant should be charged the full selling price of cylinder scales, regardless of the fact that a portion of that price might have been paid by another scale taken in exchange. This claim has not been accepted.

The scales taken in as part payment were not all handled in the same manner. Some were destroyed entirely, others were fixed up, and sold as secondhand scales, and the account stated in this report includes secondhand scales, as well as new scales, and the profit or loss on secondhand scales has been treated the same as profit or loss on new cylinder scales.

In addition to allowances for exchange scales, special allowances, or deductions from the purchase price, were made for one reason or another. It might be on account of marring or to place a scale in some advantageous place or otherwise.

After a scale was sold, and the sale entered on the books as a credit to the new sales account, it might happen that the scale would never be delivered, or it might be repossessed by the Toledo Company for failure to pay

an installment, or for some other reason. For such transaction prior to 1909 there was one account on the defendant's books, and it was in the form of debits to sales. During the year 1909 a new account was opened, called "Chargebacks"; but the old method of debiting sales also continued in force to some extent. Both accounts are called chargebacks by the witnesses testifying on that subject. These chargebacks reduced the credits to sales to the extent of such chargebacks, and the purchaser in such case forfeited whatever payment or installments he had made on the scale. The repossessed scale was refinished or rebuilt and sold over again as a new scale, and was handled the same as if it had not been the subject of a previous sale.

Resident salesmen and traveling salesmen sold defendant's scales. In some large cities the defendant maintained branch offices, with resident salesmen; outside of such large cities, scales were sold by traveling salesmen. —

Salesmen of the Toledo Company received a commission on sales made by them as compensation for their services. In making sales, agents were permitted to make an allowance of a stated amount on certain scales taken in part payment for new scales, but the salesman did not receive any commission on the amount so allowed for the exchange scale. Agents sometimes allowed a greater amount for an exchange scale than was permitted by the company, and sometimes made other allowances to the purchaser. Such excess allowance the agent had to stand, and the amount was charged against commissions in the commission account, and was credited to the customer in his account.

The chargebacks, allowances, and commissions above mentioned are an important element in the account to be stated and the manner of handling them has been a matter of controversy between the parties to this suit.

Before the taking of testimony began, on motion of the plaintiff, the master entered an order directing the defendant to prepare and file with the master an account in accordance with federal equity rule 63 (198 Fed. xxxvii, 115 C. C. A. xxxvii), specifying the information that such account should contain.

On January 15, 1915, the defendant filed an account prepared and certified to as correct by William A. Zolg, auditor of the Toledo Company, hereinafter called defendant's account. Plaintiff objected to the account, and moved for an order on defendant to make a further account in compliance with the master's order. After some discussion it was agreed that Zolg should be produced before the master for oral examination, and Zolg and other employees of defendant were afterwards produced and examined at Toledo, where the books and records were, and the motion was not again called to the master's attention.

Defendant's account covers only the period from March 8, 1911, to August 31, 1912; March 8, 1911, being the day on which the defendant began to manufacture scales with aluminum spiders. The spider in a cylinder scale is the framework inside of the cylinder. Zolg did not include in defendant's account business done prior to March 8, 1911, because he was directed by counsel for the defendant not to do so. Counsel for the defendant took the position that the defendant was not bound to account for scales not containing the aluminum spider, although Zolg in defendant's account for the period covered therein included scales with steel spiders as well as scales with aluminum spiders.

The defendant's account, covering as it does but a fraction of the accounting period, does not furnish a basis for stating the account for the entire period; but the account furnishes useful information, that has been used by other accountants who followed Zolg.

Marwick, Mitchell, Peat & Co., chartered accountants, of the city of Chicago, on plaintiff's behalf, examined the books of account and records of the Toledo Company at Toledo, and submitted a report, introduced in evidence as Plaintiff's Exhibit 40. The report is elaborate, and purports to show the profits made on cylinder scales during the accounting period. Mr. Hall, a member of the firm of Marwick-Mitchell, who directed the work, and others, who examined the books and obtained the figures used in the report, testified as witnesses in the case.

After the plaintiff had closed its case in chief, Price, Waterhouse & Co., public accountants of the city of Chicago, on behalf of the defendant, examined the books and records of the Toledo Company at Toledo and the report made by Marwick-Mitchell, together with the working papers used by Marwick-Mitchell in making their report. Price-Waterhouse prepared reports, introduced in evidence as defendant's Exhibits 21, 22, 23, 26 and 27, and later along Defendant's Exhibit 61 was introduced. Price-Waterhouse did not prepare a report from the books showing the necessary information to construct a complete account of the business. They took the report of Marwick-Mitchell, Plaintiff's Exhibit 40, as a basis, and made such additions to and deductions from the figures in that exhibit as they claimed the books and records of the defendant required. Defendant's accountants in Exhibits 21, 22, 23, 26, and 27 deal with the accounts for the year 1911 only, and, having obtained the figures for that year, use those figures as a basis of apportionment to arrive at the results of the business for the years 1906, 1907, 1908, 1909, 1910, 1911, and eight months of 1912, as shown by Defendant's Exhibit 61, covering the entire accounting period.

Price-Waterhouse attempted to reform the books of the Toledo Company as to the year 1911, and the calculations made by them and the results given are not based on the figures as they were entered on the books of the Toledo Company, but from figures that in their opinion should have been entered; that is, in many cases they disregarded the theory upon which the books were kept by the Toledo Company, and substituted theories which they regarded as better. Defendant's Exhibits 21, 22, 23, 26, and 27 are based on such reformed accounts. Defendant's Exhibit 61 is made for the purpose of applying the results of the year 1911, as disclosed in Defendant's Exhibits 21, 22, 23, 26, and 27 to the business done in the other years of the accounting period. However, the figures shown in these exhibits were practically all abandoned on the hearing before the master, and the figures disclosed in Plaintiff's Exhibit 40, as changed and corrected on the hearing, were in the main acquiesced in by the Toledo Company and have formed the basis of the account as herein stated.

After defendant's exhibits were introduced, Marwick-Mitchell prepared four additional reports, introduced in evidence as Plaintiff's Exhibits 77, 78, 79 and 80. Exhibits 77, 78, and 79 are statements comparing the figures obtained by Marwick-Mitchell for the plaintiff and Price-Waterhouse for defendant. Exhibit 80 is a statement of experimental, litigation, and patent expenses that plaintiff claims should not be credited to the Toledo Company in this account.

The Toledo Company sold scales all over the United States, in Canada, and other foreign countries. The scales sold in foreign countries other than Canada were manufactured at Toledo, and sold from Toledo, and shipments were made from Toledo to the purchasers. The defendant does not dispute the right of the plaintiff to the profits made on these scales, and they have been treated in this report in all respects the same as domestic sales.

### Gross and Net Sales of Cylinders and Fans and Per cent. Each Bears to Total Sales.

The gross sales of new cylinder and fan scales during the accounting period, exclusive of Canadian sales, are shown in the table that here follows, marked A:

#### Table A.

|  | Cylinder Scales. | Fan Scales. |
|---|---|---|
| 1906 | $ 5,760.00 | $520,925.00 |
| 1907 | 154,758.00 | 456,924.30 |
| 1908 | 459,372.50 | 444,345.81 |
| 1909 | 605,466.41 | 615,479.33 |
| 1910 | 789,358.11 | 523,625.78 |
| 1911 | 803,608.01 | 513,869.71 |
| 1912 (8 mo.) | 516,216.61 | 353,144.09 |

From these gross sales there must be deducted what are termed charge-backs. When a scale was sold that did not stay sold, or for some reason was never delivered, or was repossessed after delivery by the Toledo Company, a credit was made in the proper amount on the books, charging back the purchase price or the unpaid portion thereof. The following table B shows the net sales of new cylinder and fan scales, exclusive of Canadian sales, after deducting chargebacks. There is no dispute as to the figures used in tables A and B.

### Table B.

| | | Cylinder Scales | | | Fan Scales. |
|---|---|---|---|---|---|
| 1906................ | 55 scales at | $ 5,444.00 | 5,360 scales at | | $482,065.76 |
| 1907................ | 1,159 " " | 147,836.00 | 4,679 " " | | 420,842.84 |
| 1908................ | 3,052 " " | 437,076.75 | 4,581 " " | | 409,001.14 |
| 1909................ | 3,929 " " | 556,108.08 | 7,733 " " | | 583,572.67 |
| 1910................ | 5,060 " " | 722,625.76 | 6,615 " " | | 492,704.53 |
| 1911................ | 4,675 " " | 725,622.14 | 7,652 " " | | 475,770.27 |
| 1912 (8 mo.)........ | 2,894 " " | 469,031.71 | 4,768 " " | | 329,244.01 |

To arrive at conclusions as to credits and deductions hereafter to be made, it is necessary to ascertain the per cent. that the gross sales and also the net sales of new cylinder and fan scales bear to total sales. The following table C shows the gross per cents., and the following table D shows the net per cents.:

### Table C.

| | Cylinder Scales. | | | | Fan Scales. | | | |
|---|---|---|---|---|---|---|---|---|
| 1906...................... | 1.09% | of total gross | | | 98.91% | of total gross | | |
| 1907...................... | 25.30% | " | " | " | 74.70% | " | " | " |
| 1908...................... | 50.83% | " | " | " | 49.17% | " | " | " |
| 1909...................... | 49.58% | " | " | " | 50.42% | " | " | " |
| 1910...................... | 60.11% | " | " | " | 39.89% | " | " | " |
| 1911...................... | 60.99% | " | " | " | 39.01% | " | " | " |
| 1912 (8 mo.).............. | 59.36% | " | " | " | 40.64% | " | " | " |

### Table D.

| | Cylinder Scales. | | | | Fan Scales. | | | |
|---|---|---|---|---|---|---|---|---|
| 1906...................... | 1.14% | of total net | | | 98.86% | of total net | | |
| 1907...................... | 26.00% | " | " | " | 74.00% | " | " | " |
| 1908...................... | 51.66% | " | " | " | 48.34% | " | " | " |
| 1909...................... | 48.80% | " | " | " | 51.20% | " | " | " |
| 1910...................... | 59.46% | " | " | " | 40.54% | " | " | " |
| 1911...................... | 60.40% | " | " | " | 39.60% | " | " | " |
| 1912 (8 mo.).............. | 59.36% | " | " | " | 41.24% | " | " | " |

To obtain the gross business, excluding Canadian, the secondhand scale sales must be added. The following table E shows the gross cylinder sales, gross fan sales, gross secondhand sales, and the total gross sales:

### Table E.

| | Cylinders. | Fans. | Secondhands. | Total. |
|---|---|---|---|---|
| 1906 ................. | $ 5,760.00 | $520,925.00 | | $ 526,685.00 |
| 1907 ................. | 154,758.00 | 456,924.30 | $ 850.00 | 612,532.30 |
| 1908 ................. | 459,372.50 | 444,345.81 | 21,647.10 | 925,365.41 |
| 1909 ................. | 605,466.41 | 615,479.33 | 48,345.70 | 1,269,291.44 |
| 1910 ................. | 789,358.11 | 523,625.78 | 92,107.79 | 1,405,091.68 |
| 1911 ................. | 803,608.01 | 513,869.71 | 94,820.35 | 1,412,298.07 |
| 1912 (8 mo.)......... | 516,216.61 | 353,144.09 | 95,170.80 | 964,531.50 |

Hereafter in the report the different cost figures will contain expenses of secondhand scales and therefore cylinder scales should receive credit for a part of the secondhand sales. The following table F shows the net sales of

secondhand scales and the part thereof to be added to cylinder sales, apportioned on the percentage that net sales of new cylinder scales bear to total net sales of new scales:

Table F.

| | | | | | | |
|---|---|---|---|---|---|---|
| 1906 | No secondhand sales. | | | | | |
| 1907 | 26.00% of | $ 850.00 | secondhand sales | $ | 221.00 |
| 1908 | 51.66% of | 21,647.10 | " " " | | 11,182.89 |
| 1909 | 48.80% of | 48,345.70 | " " " | | 23,592.70 |
| 1910 | 59.46% of | 92,107.79 | " " " | | 54,767.29 |
| 1911 | 60.40% of | 94,820.35 | " " " | | 57,271.49 |
| 1912 (8 mo.) | 58.76% of | 85,872.30 | " " " | | 50,458.56 |

Manufacturing and Selling Expenses and Other Deductions—Manufacturing Cost.

The defendant kept no cost sheets or cost records during the accounting period, and to arrive at costs reliance must be placed on the cost figures given in the defendant's account filed herein, pursuant to an order of the master directing the defendant to file an account in compliance with federal equity rule 63.

The account was prepared by Mr. Zolg, auditor of the Toledo Company, and covers the last ten months of 1911 and the first eight months of 1912. The information upon which Mr. Zolg bases his cost figures was obtained by him during the many years he was in charge of the accounting department, and from reports and information procured by him as to labor and material costs from the factory auditing department, and from books, records, and sources available to him. His connection with the Toledo Company renders it practically certain that the cost figures furnished by him are not unfair to that company, and such cost figures have been accepted and relied upon by the plaintiff, and have been adopted in this report as the safest method of obtaining the manufacturing cost. The method used by Zolg in making the account as to overhead expenses has been approved and used by the accountants on both sides of the case. While the defendant's account covers only the period above mentioned, the cost of labor and material did not vary materially during the accounting period, and it is therefore safe to apply Zolg's costs for 1911 and 1912 to the remainder of the period.

To obtain the cost of direct labor and material the net number of scales sold in each year has been multiplied by the cost figures given in defendant's account for the different styles of scales sold during the year. In cases where no cost was given for a particular style number of scale, the cost figure used was the figure that the evidence showed applied to the scale nearest to it in cost for which a cost figure was furnished, and which was substantially the same (Plaintiff's Exhibit 40). The net sales rather than the gross sales are used, because repossessed scales were sold over again as new scales, and took a manufacturing cost when resold, and, if the gross sales are taken, repossessed scales would receive a double manufacturing cost.

Having obtained in this way the cost of direct labor and material of cylinder scales, it is necessary to find the factory overhead of cylinder scales. The factory overhead that went into manufacturing cost is found in the following accounts on the defendant's books: Indirect Labor, Factory Supplies, Experimental, Tools and Patterns, Packing and Shipping, Lumber, Trucking, Maintenance, Repairs and Alterations, Power, Heating and Light, Superintendent and Factory Office, Miscellaneous Factory Expense, and Refinishing Expense. The total direct labor and material for fans and cylinders and the total factory overhead for fans and cylinders are given on the books of the Toledo Company and are not disputed.

Following the method used in defendant's account and by the accountants on both sides of the case, the total direct labor and material for fans and cylinders should be divided into total factory overhead for fans and cylinders, and it will be found that the total factory overhead for each year is a certain per cent. of total direct labor and material for each year, and on the theory that factory overhead for cylinder scales will bear the same ratio to

direct labor and material for cylinders that total factory overhead for fans and cylinders bears to total direct labor and material for fans and cylinders, the per cent. figure so obtained should be used to find the factory overhead apportionable to cylinder scales.

The following table G shows the direct labor and material and factory overhead applicable to cylinder scales ascertained as above stated:

Table G.

|  | Direct Labor and Material. | Factory Overhead. | Total Manufacturing Cost. |
|---|---|---|---|
| 1906 | $ 817.30 | $ 403.91 | $ 1,221.21 |
| 1907 | 17,203.93 | 7,425.22 | 24,629.15 |
| 1908 | 45,187.17 | 18,612.60 | 63,799.77 |
| 1909 | 58;260.64 | 21,032.09 | 79,292.73 |
| 1910 | 76,457.55 | 48,130.03 | 124,587.58 |
| 1911 | 74,151.95 | 59,447.52 | 133,599.57 |
| 1912 (8 mo.) | 46,157.98 | 33,556.85 | 79,714.83 |

In the manufacturing costs given above in each year there has been apportioned to and included in cylinder cost of manufacture a portion of the expenses shown in an account carried on the books of the Toledo Company called the Experimental Account. This is an account of the expenses of the Toledo Company's invention department. The evidence does not show the nature and character of the items of this account, nor does it show that any of the expenses in this account were incurred on account of cylinder scales or had anything to do with cylinder scales. One De Vilbiss, an inventor, was employed by the Toledo Company, and was for several years at the head of this department. What De Vilbiss did, and what others under him or connected with that department may have done, or what the moneys charged as expenses were paid out for, is not shown by the evidence. In fact, it appears that nobody connected with the Toledo Company knows what the charges in this account represent.

Because of the absence of evidence as to the transactions and expenditures upon which the items of expense found in this account are based, the amounts yearly that have been already included in the manufacturing cost of cylinder scales should be deducted.

The following table H shows the amount that has been included each year in manufacturing cost on account of the charges in this Experimental Account, and it shows also the amount of manufacturing cost after deducting these accounts:

Table H.

| 1906 | $ 82.96 | charged | which | deducted | leaves | cost | $ 1,138.25 |
|---|---|---|---|---|---|---|---|
| 1907 | 994.38 | " | " | " | " | " | 23,634.77 |
| 1908 | 2,896.49 | " | " | " | " | " | 60,903.28 |
| 1909 | 3,355.81 | " | " | " | " | " | 75,936.92 |
| 1910 | 4,801.54 | " | " | " | " | " | 119,786.04 |
| 1911 | 5,368.60 | " | " | " | " | " | 128,230.97 |
| 1912 (8 mo.) | 4,061.90 | " | " | " / | " | " | 75,652.93 |

### Commissions.

The salesmen of the Toledo Company were compensated for their services with commissions on sales. The amounts paid out on account of commissions for the various years of the accounting period are shown on the books of the company and are not in dispute.

There is a controversy between the parties as to the manner of arriving at the amount of commissions chargeable against cylinder scales. The plaintiff suggests that for the years 1906, 1907, 1908, 1909, and 1910 the commissions should be found by apportioning the total commissions shown on the books between cylinder and fan scales and that for the years 1911 and 1912, as defendant's account filed herein covering the last ten months of 1911 and the first eight months of 1912 shows the commissions paid to agents on cylinder

scale sales and the number of cylinder scales sold during that time, the average commission on a scale should be found for the years 1911 and 1912, respectively, and the average commissions so found should be applied to the number of cylinder scales sold in 1911 and 1912, respectively, to ascertain the commissions for those two years.

Mr. Zolg, who made the defendant's account, reported the net commissions received by agents after the company had deducted therefrom excess allowances made by such agents to purchasers, and did not report the amount of commission the agent was entitled to on such sales or that the company in fact paid. An agent sometimes made a greater allowance to a purchaser than he was authorized to make. In such cases the excess allowance was charged against his commissions in the commission account, and he was paid the difference between the commission earned on the sale and the amount of the excess allowance.

The defendant suggests that its accounts allocated the commissions for 1911 to cylinder scales, and that such allocation should stand for the year 1911 and be used as a basis of arriving at commissions for the other years of the accounting period. The so-called allocation of 1911 was reached by reforming the commission account as shown on the books to conform to the theory of defendant's accountants, and it was found impossible to allocate commissions to specific sales or to keep the business of 1911 separate and apart from the business of a portion of 1910 and a portion of 1912. The method used to ascertain commissions for the other years of the accounting period on the basis of 1911 might produce grossly inaccurate results, and the method used, the results of which are shown in the following table, is better suited to produce reasonably accurate results.

The plaintiff's suggestion as to the years 1906, 1907, 1908, 1909, and 1910 has been adopted, and as to the years 1911 and 1912 has been rejected. The defendant's suggestion has been rejected.

The commissions attributable to cylinder scales have been determined by finding the per cent. that total commissions bear to total net sales for each year and taking that per cent. of cylinder net sales for each year. The net sales rather than gross sales have been used as the basis of calculation because commissions were allowed only on net sales. The following table shows the result:

### Table I.

|  | Per Cent. of Commissions to Total Net Sales. | | Cylinder Net Sales. | | Commissions Chargeable to Cylinder Sales. |
|---|---|---|---|---|---|
| 1906 | 31.73% | of $ | 5,544.00 | gives $ | 1,759.11 |
| 1907 | 34.20% | " | 148,057.00 | " | 50,635.49 |
| 1908 | 38.39% | " | 448,259.64 | " | 172,086.82 |
| 1909 | 35.36% | " | 579,700.78 | " | 204,982.20 |
| 1910 | 31.38% | " | 777,393.05 | " | 243,945.94 |
| 1911 | 27.57% | " | 782,893.93 | " | 215,843.86 |
| 1912 (8 mo.) | 28.41% | " | 519,490.27 | " | 147,587.19 |

#### Commercial and Selling Overhead.

The total commercial and selling overhead of the Toledo Company for the entire accounting period is not in dispute. It is made up of the following accounts: District Managers' Salaries and Expenses, Branch Office Expense, Miscellaneous Selling Expense, Cash and Quantity Discounts, Collection and Exchange Expense, Fidelity Bonds Expense, Freight on Scales, Insurance, Dining Room Expense, Legal Expense, Litigation Expense, Patent Expense, Office Pay Roll, Office Supplies, Postage, Recording Orders, Rents, Taxes, Telephone and Telegraph, General Expense.

There is a dispute as to whether, in apportioning these expenses between cylinder and fan sales, the apportionment should be made on the basis of net sales or on the basis of gross sales. Inasmuch as commercial and selling overhead is necessary in making sales, whether those sales stand or whether they are rescinded, the division should be made on the basis of gross sales.

The following table J shows the total commercial and selling overhead for the respective years and the portion thereof chargeable to cylinder sales. For the per cent. figures used herein see table C.)

### Table J.

|  |  | Total Commercial and Selling. | Applicable to Cylinder Scales. |
|---|---|---|---|
| 1906...... .................... | 1.09% of | $142,971.51 | gives $ 1,558.39 |
| 1907......................... | 25.30% " | 145,800.00 | " 36,887.40 |
| 1908.......... .....50.83% " | 50.83% " | 188,249.67 | " 95,687.30 |
| 1909......................... | 49.58% " | 279,869.26 | " 138,759.18 |
| 1910......................... | 60.11% " | 367,934.92 | " 221,165.65 |
| 1911......................... | 60.99% " | 406,626.99 | " 248,001.70 |
| 1912 (8 mo.)................ | 59.36% " | 274 573.75 | " 163,046.98 |

In the above commercial and selling overhead apportioned to cylinder scale sales are included the following amounts of litigation and patent expenses that should be deducted:

### Table K.

| 1906............. | 1.09% of $ 7,965.55, | $ 83.88, | deducted leaves $ 1,474.51 |
|---|---|---|---|
| 1907............. | 25.30% " 14,173.88, | 3,585.99, | " " 33,301.41 |
| 1908............. | 50.83% " 9,079.21, | 4,614.06, | " " 91.073.24 |
| 1909............. | 49.58% " 9,588.57, | 4,754.01, | " " 134,005.17 |
| 1910............. | 60.11% " 13,012.65, | 7,821.90, | " " 213,343.75 |
| 1911............. | 60.99% " 17,159.52, | 10,465.59, | " " 237,536.11 |
| 1912 (8 mo.)..... | 59.36% " 22,525.68, | 13,371.24, | " " 149,675.74 |

The expense of the Legal Expense Account, such, for example, as the expense of collecting accounts, have been included in commercial and selling expenses. Litigation and Patent Expense are of a different character. The plaintiff introduced evidence as to these expenses in the years 1911 and 1912, showing that the items were for expenses of this litigation, expenses of obtaining patents in this and foreign countries and other like charges. No evidence was introduced by either side explaining the items in these accounts for the other years of the accounting period, and it must therefore be assumed that they are of the same general character and not allowable as deductions in favor of the defendant. For vouchers and copies of these accounts for 1911 and 1912 see volume I of the transcript, pp. 378–382, 391–395, 400–410, 328–334, 215–274.

### Losses on Agents' and Customers' Accounts.

The amount to be allowed the defendant on account of losses on agents' and customers' accounts was adjusted by agreement between counsel before the master. By this agreement there is to be allowed to the defendant 3 per cent. on net sales of cylinder scales for each year of the accounting period, except for the eight months of 1912. As to that period it was agreed that the amount shown in the defendant's account which was for new scales only should be taken, and to this figure should be added 3 per cent. of secondhand cylinder sales, making the amount shown in the table. In addition to the above, it was agreed that $5,166.46 should be distributed over the years in proportion to the losses in those years as shown by the following table:

### Table L.

| 1906...............3% on cyl. sales, $ | 166.32 | plus $ 5.27 = $ | 171.59 |
|---|---|---|---|
| 1907..... ........3% " " " | 4,441.71 | plus 233.99 = | 4,675.70 |
| 1908...............3% " " " | 13,447.79 | plus 708.28 = | 14,156.07 |
| 1909...............3% " " " | 17,391.02 | plus 916.45 = | 18,307.47 |
| 1910..... ........3% " " " | 23,321.79 | plus 1,228.96 = | 24,550.75 |
| 1911...............3% " " " | 23,486.82 | plus 1,147.17 = | 24,633.99 |
| 1912 (8 mo.)....... (see above) | 19,066.42 | plus 926.34 = | 19,992.76 |
|  | 101,321.87 | plus 5,166.46 | 106,488.33 |

### Allowances.

The total allowances for secondhand scales taken in part payment for new scales for the different years of the accounting period are shown on the books of the Toledo Company, and the amounts shown are conceded to be correct. The books do not show how much of the allowances for any years was made on cylinder sales, or how much was made on fan sales, and some plan must be adopted to determine how much of the allowances is properly chargeable against cylinder scales.

The defendant claims that its accountants examined the books of the Toledo Company and allocated to cylinder sales the allowances actually made on cylinder scale sales for the year 1911, and contends that the amount so allocated should be the amount charged against cylinder sales for 1911, and that the amount to be charged against cylinder sales for the other years of the accounting period should be found by taking the per cent. of cylinder gross sales for each of the other years of the accounting period that cylinder allowances as shown by such allocation bear to cylinder gross sales for the year 1911.

It is not claimed that the accountants made an exact allocation of allowances to cylinder scales for the year 1911. It is conceded that the attempted allocation included a portion of the business of 1910 and a portion of the business of 1912, and the manner in which the books were kept, without any effort to distinguish between fans and cylinders, and the great number of transactions that had to be analyzed in the time the accountants gave to this work render it uncertain whether the claimed allocation would produce reasonably accurate results.

The method adopted as most suitable to produce reasonably accurate results for all of the years of the accounting period is to take that per cent. of total allowances that cylinder net sales bear to total net sales. Net sales rather than gross sales are used, because, when a sale was rescinded and the scale repossessed, all allowances made on such rescinded sale were deducted from the allowance account.

The following table M shows the total allowances, the per cent. of cylinder net sales to total net sales as given in table D, and the allowances chargeable to cylinder sales:

### Table M

| | Total Allowances | Applicable to Cylinders | | |
|---|---|---|---|---|
| 1906 | $ 18,554.45 | 1.14% | thereof | $ 211.52 |
| 1907 | 24,737.50 | 26.00% | " | 6,431.75 |
| 1908 | 82,905.26 | 51.66% | " | 42,828.86 |
| 1909 | 82,779.23 | 48.80% | " | 40,396.26 |
| 1910 | 101,359.87 | 59.46% | " | 60,268.58 |
| 1911 | 150,194.94 | 60.40% | " | 90,717.74 |
| 1912 | 91,578.56 | 58.76% | " | 53,811.56 |

### Interest on Investment.

That the defendant is entitled in this accounting to credit for interest on its investment in the business is not disputed. The plaintiff and defendant, however, disagree radically as to the proper basis for arriving at the amount for which defendant should have credit. The method suggested by the defendant has been adopted in this report. It is to take from the yearly statements, Plaintiff's Exhibits 8 to 15, the valuations of the tangible assets, excluding therefrom patents and good will, and on the investment thus ascertained for each year calculate interest at the rate of 5 per cent. per annum, and apportion that interest so calculated to cylinder sales in the respective years on the ratio that cylinder gross sales bear to total gross sales as shown by table C.

The following table N shows the total investment for each year, interest thereon at the rate of 5 per cent. per annum, and the amount of such interest apportionable to cylinder sales:

Table N.

|  | Investment. | Interest at 5%. | | | Apportionable to Cylinder Sales. | |
|---|---|---|---|---|---|---|
| 1906 | $ 362,040 | $18,102 | of which | 1.09% = | $ | 197.31 |
| 1907 | 423,220 | 21,161 | " | " | 25.30% = | 5,353.73 |
| 1908 | 551,820 | 27,591 | " | " | 50.83% = | 14,024.50 |
| 1909 | 634,600 | 31,730 | " | " | 49.58% = | 15,731.73 |
| 1910 | 950,000 | 47,500 | " | " | 60.11% = | 28,552.25 |
| 1911 | 1,000,000 | 50,000 | " | " | 60.99% = | 30,495.00 |
| 1912 (8 mo.) | 1,000,000 | 33,333 | " | " | 59.36% = | 19,786.66 |

Canadian Business.

In addition to the business of the Toledo Company already considered, that company carried on a Canadian business from some time in 1908 to the end of the accounting period. The scales were all assembled in Canada, and all sold in Canada, though some of the parts were made at the Toledo plant and some of the parts were procured in Canada. The evidence does not make it clear whether at any time during the period all of the parts were made at the Toledo plant, nor does the evidence make it clear that at any time during the period all of the parts were made in Canada.

The first sales of cylinder scales in Canada were made in 1908, presumably through the agency of Joseph P. Cleal, as it appears from the evidence that in 1909, a year later, Cleal maintained a branch office in Toronto, where parts were assembled into completed scales. Some time in 1910 an assembling plant was established at Windsor, Canada, and thereafter all scales sold in Canada were assembled at this plant. From the time Canadian sales began in 1908 to the time the Windsor plant was established in 1910, parts of scales were manufactured at the Toledo plant and shipped to Canada, where they were assembled. Whether during this time all of the parts necessary to make a completed scale were sent from the Toledo plant, or whether some of the parts were procured in Canada, is not made clear by the evidence. After the assembling plant was established at Windsor in 1910, certain parts of the scales, such as pinions, spiders, hubs, screws, etc., were shipped from Toledo to Windsor, and other parts such as castings, were procured and shipped direct from Hamilton, Ontario, to Windsor, and there assembled.

The accounts relating to Canadian sales were carried on the books of the Toledo Company. Up to November 11, 1908, the Canadian sales were carried in the United States Sales Account, but on that day a Canadian Sales Account was opened. Beginning with the opening of the Windsor factory in 1910 the Canadian sales were kept in a separate section of the general journal of the company, and a separate Canadian ledger was opened. Up until the beginning of 1912 there was no separate account kept of the items of expense of the Canadian business, but from the beginning of 1912 until the end of the accounting period the items of discount, collection, freight, and legal expense were separated. Canadian items enter into other accounts, such as postage, recording orders, losses on customers' accounts, miscellaneous expense, supplies account, lumber, packing and shipping, etc.

The following table shows the total Canadian sales, both fans and cylinder, and separately the total cylinder sales:

Table O.

| 1908 | Total sales, | $ 15,262.50; | cylinder | sales | $10,610.00 |
|---|---|---|---|---|---|
| 1909 | " " | 77,667.41; | " | " | 48.924.50 |
| 1910 | " " | 107,911.92; | " | " | 73,358.35 |
| 1911 | " " | 149,644.23; | " | " | 97,798.51 |
| 1912 (8 mo.) | " " | 108,960.00; | " | " | 67,190.45 |

The books and records of the Toledo Company show the total Canadian profits. The following table shows such total profits for both fans and cylinders, the per cent. of cylinder sales to total Canadian sales, and the profits on cylinder sales:

### Table P.

|  | Total Profit. | Per Cent. of Cyl. to Total Canadian Sales. | Cylinder Profit. |
|---|---|---|---|
| 1908 | $ 6,317.67 | 69.52% | $ 4,392.04 |
| 1909 | 15,754.42 | 63.00% | 9,925.28 |
| 1910 | 20,097.70 | 67.98% | 13,662.41 |
| 1911 | 26,062.32 | 65.35% | 17,031.73 |
| 1912 (8 mo.) | 18,047.31 | 61.67% | 11,129.78 |

Total cylinder profit, Canadian.........................$56,141.24

The figures given in the above tables O and P are not in dispute. They are shown in Plaintiff's Exhibits 8, 9, 10, 11, and 12, and are the figures adopted by both sides.

The plaintiff claims that it is entitled to be credited with the profits shown above in this accounting; but as Canadian scales were assembled and sold in Canada, and not in the United States, and some parts of the scales were during part or all of the time procured in Canada, profits on such sales have not been included.

Since profits have not been allowed on Canadian business, the defendant should be charged with all expenses on account of Canadian business that have entered into cost figures heretofore considered in relation to the United States business, and this the defendant concedes, as the manufacturing cost of United States sales was obtained by using a per scale cost for direct labor and material, and taking the per cent. of the figure thus obtained that total factory overhead bore to total net sales to find the factory overhead, it follows that the manufacturing cost of United States scales does not include anything on account of Canadian scales, and nothing should be charged on account thereof. There should, however, be charged against the defendant on account of Canadian business a proportionate part of commercial and selling overhead expense of the Toledo Company, after deducting therefrom items of expense that are applicable only to sales made in the United States, such as district managers' salaries and expenses, special salesmen's salaries and expenses, branch office expenses, etc. In addition to these deductions, there should also be deducted litigation expense, since litigation expense has not in this report been included in the expenses of the United States business. (See table K, where same was deducted.)

The following statement shows the amount of expenses each year in which Canadian business was done that should be charged against the defendant in this accounting, or, what is equivalent, added to the plaintiff's profits, as having already entered into commercial and selling overhead expense of United States scales:

### Year 1908.

Cylinder sales (net)........................................... $437,076.75
Fan sales (net) ............................................... 409,001.14
Canadian sales (net)........................................... 15,262.50

Total ................................................... $861,340.39

Of this total amount Canadian sales are 1.77 per cent.

Total commercial and selling overhead is....................... $188,249.67
From which there should be deducted:
Branch office expenses.............................. $43,911.03
District agents' expenses .......................... 8,089.85
Litigation expense ................................ 9,079.21    61,080.09

$127,169.58

Of which 1.77 per cent., represented by the Canadian business, is $2,250.59. In 1908 there was charged to cylinder sales 50.83 per cent. of the total commercial and selling overhead; 50.83 per cent. of Canadian commercial and selling overhead, $2,250.90, is $1,144.13 which should be added to cylinder profits.

### Year 1909.

| | |
|---|---:|
| Cylinder sales (net)................................................ | $ 556,108.08 |
| Fan sales (net)................................................... | 583,572.67 |
| Canadian sales (net).............................................. | 77,767.41 |
| **Total** ........................................................ | **$1,217,448.16** |

Of this total amount Canadian sales are 6.22 per cent.

| | | |
|---|---:|---:|
| Total commercial and selling overhead is...................... | | $279,869.26 |
| From which there should be deducted: | | |
| District managers' salaries ..........................$ | 5,680.00 | |
| District managers' expenses........................... | 8,302.74 | |
| Special salesmen's salaries........................... | 2,755.00 | |
| Special salesmen's expenses........................... | 1,610.27 | |
| Branch office expenses................................ | 57,902.22 | |
| Litigation expenses ................................. | 9,588.57 | 85,838.80 |
| | | **$194,030.46** |

Of which 6.22 per cent. is $12,068.69, Canadian commercial and selling overhead. In 1909 there was charged to cylinder sales 49.58 per cent. of the total commercial and selling overhead; 49.58 per cent. of Canadian commercial and selling overhead, $12,068.69, is $5,983.65, which should be added to cylinder profits.

### Year 1910.

| | |
|---|---:|
| Cylinder sales (net)............................................... | $ 722,625.76 |
| Fan sales (net)................................................... | 492,704.53 |
| Canadian sales (net).............................................. | 107,911.92 |
| **Total** ........................................................ | **$1,323,242.21** |

Of this total amount Canadian sales are 8.15 per cent.

| | | |
|---|---:|---:|
| Total commercial and selling overhead is...................... | | $367,934.92 |
| From which there should be deducted: | | |
| District managers' salaries........................... | $39,323.37 | |
| District managers' expenses........................... | 12,287.88 | |
| Special salesmen's salaries........................... | 7,552.16 | |
| Special salesmen's expenses........................... | 3,426.89 | |
| Branch office expenses................................ | 83,157.90 | |
| District managers' convention........................ | 145.25 | |
| Litigation expense ................................... | 13,012.65 | 158,906.10 |
| | | **$209,028.82** |

Of which 8.15 per cent. is $17,035.85, Canadian commercial and selling overhead. In 1910 there was charged to cylinder scales .60.11 per cent. of the total commercial and selling overhead; 60.11 per cent. of Canadian commercial and selling overhead, $17,035.85, is $10,240.24, which should be added to cylinder profits.

### Year 1911.

| | |
|---|---:|
| Cylinder sales (net)............................................... | $ 725,671.39 |
| Fan sales (net)................................................... | 475,770.27 |
| Canadian sales (net).............................................. | 149,644.23 |
| **Total** ........................................................ | **$1,351,085.89** |

Of this total amount Canadian sales are 11.70 per cent.

| | | |
|---|---:|---:|
| Total commercial and selling overhead is...................... | | $406,626.99 |
| From which there should be deducted: | | |
| District managers' salaries........................... | $ 42,400.37 | |
| District managers' expenses........................... | 11,577.91 | |
| District managers' convention........................ | 252.25 | |
| Special salesmen's salaries and expenses............. | 66.29 | |
| Branch office expenses................................ | 115,173.59 | |
| Freight outbound ..................................... | 12,991.19 | |
| Freight inbound ...................................... | 2,844.67 | |
| Litigation expense ................................... | 17,159.52 | 202,465.79 |
| | | **$204,161.20** |

Of which 11.70 per cent. is $23,886.86, Canadian commercial and selling overhead. In 1911 there was charged to cylinder sales 60.99 per cent. of the total commercial and selling overhead; 60.99 per cent. of Canadian commercial and selling overhead, $23,886.86, is $14,568.59, which should be added to cylinder profits.

### Year 1912 (8 Mo.).

| | |
|---|---:|
| Cylinder sales (net) | $469,031.71 |
| Fan sales (net) | 329,244.01 |
| Canadian sales (net) | 108,960.00 |
| **Total** | **$907,235.72** |

Of this total amount Canadian sales are 12.01 per cent.

| | | |
|---|---:|---:|
| Total commercial and selling overhead is | | $274,573.75 |
| From which should be deducted: | | |
| District managers' salaries | $24,247.70 | |
| District managers' expenses | 6,142.10 | |
| Branch office expenses | 66,654.29 | |
| District managers' convention | 1,381.95 | |
| Freight outbound | 8,365.44 | |
| Freight inbound | 2,800.82 | |
| Cash discounts | 10,242.80 | |
| Collection and exchange | 3,476.41 | |
| Legal expenses | 7,840.30 | |
| Quantity discount | 883.50 | |
| Litigation expense | 22,525.68 | 154,560.99 |
| | | **$120,012.76** |

Of which 12.01 per cent. is $14,413.53, Canadian commercial and selling overhead. In 1912 there was charged to cylinder sales 59.36 per cent. of the total commercial and selling overhead; 59.36 per cent. of Canadian commercial and selling overhead, $14,413.53, is $8,555.87, which should be added to cylinder profits.

The following table Q shows the proportion of commercial and selling overhead expenses to be added to cylinder profit on account of Canadian business:

### Table Q.

| | |
|---|---:|
| 1908 | $ 1,144.13 |
| 1909 | 5,983.65 |
| 1910 | 10,240.24 |
| 1911 | 14,568.59 |
| 1912 (8 mo.) | 8,555.87 |
| **Total** | **$40,492.48** |

### Statement of Whole Account.

The following statement is based on figures in the tables already given, A to Q, inclusive, and shows the profits on cylinder scales for each year of the accounting period:

### 1906

| | | |
|---|---:|---:|
| Cylinder gross sales | | $ 5,760.00 |
| Deduct chargebacks | | 216.00 |
| Cylinder net sales | | $ 5,544.00 |
| Deduct manufacturing cost | $ 1,138.25 | |
| Deduct commissions | 1,759.11 | |
| Deduct commercial and selling | 1,474.51 | |
| Deduct losses | 171.59 | |
| Deduct allowances | 211.52 | |
| Deduct interest | 197.31 | 4,952.29 |
| | | $    591.71 |

### 1907

| | |
|---|---:|
| Cylinder gross sales | $154,758.00 |
| Deduct chargebacks | 6,922.00 |

| | |
|---|---:|
| Cylinder net sales | $147,836.00 |
| Add secondhand sales proportion | 221.00 |

| | |
|---|---:|
| | $148,057.00 |

| | | |
|---|---:|---:|
| Deduct manufacturing cost | $ 23,634.77 | |
| Deduct commissions | 50,635.49 | |
| Deduct commercial and selling | 33,301.41 | |
| Deduct losses | 4,675.70 | |
| Deduct allowances | 6,431.75 | |
| Deduct interest | 5,353.73 | $124,032.85 |

| | |
|---|---:|
| | $ 24,024.15 |

### 1908

| | |
|---|---:|
| Cylinder gross sales | $459,372.50 |
| Deduct chargebacks | 22,295.75 |

| | |
|---|---:|
| Net cylinder sales | $437,076.75 |
| Add secondhand sales proportion | 11,182.89 |
| Add Canadian commercial overhead proportion | 1,144.13 |

| | |
|---|---:|
| | $449,403.77 |

| | | |
|---|---:|---:|
| Deduct manufacturing cost | $ 60,903.28 | |
| Deduct commissions | 172,086.82 | |
| Deduct commercial and selling | 91,073.24 | |
| Deduct losses | 14,156.07 | |
| Deduct allowances | 42,828.26 | |
| Deduct interest | 14,024.50 | $395,072.17 |

| | |
|---|---:|
| | $ 54,331.60 |

### 1909

| | |
|---|---:|
| Cylinder gross sales | $605,466.41 |
| Deduct chargebacks | 49,358.33 |

| | |
|---|---:|
| Net cylinder sales | $556,108.08 |
| Add secondhand sales proportion | 23,592.70 |
| Add Canadian commercial overhead proportion | 5,983.65 |

| | |
|---|---:|
| | $585,684.43 |

| | | |
|---|---:|---:|
| Deduct manufacturing cost | $ 75,936.92 | |
| Deduct commissions | 204,982.20 | |
| Deduct commercial and selling | 134.005.17 | |
| Deduct losses | 18.207.47 | |
| Deduct allowances | 40,396.26 | |
| Deduct interest | 15,731.73 | $489,259.75 |

| | |
|---|---:|
| | $ 96,424.68 |

### 1910

| | |
|---|---:|
| Cylinder gross sales | $789,358.11 |
| Deduct chargebacks | 66,732.35 |

| | |
|---|---:|
| Net cylinder sales | $722,625.76 |
| Add secondhand sales proportion | 54,767.29 |
| Add Canadian commercial overhead proportion | 10,240.24 |

| | |
|---|---:|
| | $787,633.29 |

| | | |
|---|---:|---:|
| Deduct manufacturing cost | $119,786.04 | |
| Deduct commissions | 243,295.94 | |
| Deduct commercial and selling | 213,343.75 | |
| Deduct losses | 24,550.75 | |
| Deduct allowances | 60,268.58 | |
| Deduct interest | 28,552.25 | 690,447.31 |

| | |
|---|---:|
| | $ 97,185.98 |

### 1911

| | |
|---|---|
| Cylinder gross sales | $803,608.01 |
| Deduct chargebacks | 77,985.87 |
| | |
| Net cylinder sales | $725,622.14 |
| Add secondhand sales proportion | 57,271.49 |
| Add Canadian commercial overhead proportion | 14,568.59 |
| | |
| | $797,462.22 |

| | | |
|---|---|---|
| Deduct manufacturing cost | $128,230.97 | |
| Deduct commissions | 215,843.86 | |
| Deduct commercial and selling | 237,536.11 | |
| Deduct losses | 24,633.99 | |
| Deduct allowances | 90,717.74 | |
| Deduct interest | 30,495.00 | 727,457.67 |
| | | |
| | | $ 70,004.55 |

### 1912 (8 mo.).

| | |
|---|---|
| Cylinder gross sales | $516,216.61 |
| Deduct chargebacks | 47,184.90 |
| | |
| Net cylinder sales | $469,031.71 |
| Add secondhand sales proportion | 50,458.56 |
| Add Canadian commercial overhead proportion | 8,555.87 |
| | |
| | $528,046.14 |

| | | |
|---|---|---|
| Deduct manufacturing cost | $ 75,652.93 | |
| Deduct commissions | 147,587.19 | |
| Deduct commercial and selling | 149,675.74 | |
| Deduct losses | 19,992.76 | |
| Deduct allowances | 53,811.56 | |
| Deduct interest | 19,786.66 | 466,506.84 |
| | | |
| | | $ 61,539.30 |

| | |
|---|---|
| Profit for 1906 | $ 591.71 |
| Profit for 1907 | 24,024.15 |
| Profit for 1908 | 54,331.60 |
| Profit for 1909 | 96,424.68 |
| Profit for 1910 | 97,185.98 |
| Profit for 1911 | 70,004.55 |
| Profit for 1912 | 61,539.30 |
| | |
| Total profits | $404,101.97 |

### Scales on Hand.

When the patent expired on the 3d day of September, 1912, the Toledo Company had on hand manufactured and ready for sale 1,839 cylinder scales. These scales were manufactured during the infringing period and ready for sale after the close of the infringing period.

It is claimed that, while these scales had not been sold when the patent expired, there was a profit in them that the plaintiff is entitled to recover in this suit.

The profit made on 20,824 cylinder scales sold during the entire accounting period was $404,101.97, or $19.40 per scale. The profit made on the 2,894 cylinder scales sold during the eight months of 1912, immediately preceeding the expiration of the patent, was $61,539.30 or $21.26 per scale. The plaintiff claims that it is entitled to recover as profits for scales on hand at the close of the accounting period $19.40 per scale, being the average profit for the entire accounting period, amounting to $35,676.00.

Inasmuch as the profit in scales on hand was not in fact realized during the accounting period and can only be inferred, and the evidence does not

show that profit was realized afterwards by the defendant, such profit has not been included in this accounting.

### Good Will.

The plaintiff claims that it should be allowed as profits in this accounting the value of the business gained by the defendant through its infringement, busing its claim on the fact that at the end of the accounting period the defendant had acquired by its infringement a going business in indicator drum scales of about $800,000 a year upon which a large profit was made.

While there can be no doubt that the business in cylinder scales built up by the defendant during the infringing period was a gain, value, or advantage to the defendant at and after the close of that period, I find no evidence upon which to base a finding of money value that should be allowed on account thereof. Any allowance would necessarily be based on speculation. I have therefore not included anything on account of good will in this accounting.

### Divisions of Profits.

The plaintiff proved that substantial profits were realized by the defendant in making and selling the infringing scale. This the defendant does not deny, but it contends that not all of the profits made are due to the patent, because there were embodied in its cylinder scale noninfringing elements and improvements, patented and unpatented, such as the counterforce system, base and lever system, dash pot, shock absorber, leveling device, etc., that contributed to the profit fund.

The eight patents under which defendant claims its cylinder scales were built were introduced in evidence as follows: Reissue No. 12,138, Defendant's Exhibit 63; No. 667,652, Defendant's Exhibit 38; No. 830,976, Defendant's Exhibit 39; No. 839,736, Defendant's Exhibit 37; No. 1,068,616, Defendant's Exhibit 47; No. 1,122,222, Defendant's Exhibit 60; No. 1,142,165, Defendant's Exhibit 62; and No. 1,166,128, Defendant's Exhibit 59. These patents are combination patents and do not cover the elements separate from the combination.

The elements that defendant contends contributed to the profits were old and open to the public, and none of them, if separated from the structure of which it is a part, would in itself be a usable or workable tool.

Two infringing scales were introduced in evidence one marked "Complainant's Exhibit Defendant's scale" and the other "Defendant's Exhibit 55," disclosing the structural parts of the completed scale.

The defendant called three witnesses experienced in the scale art: Halvor C. Hem, consulting engineer for the Toledo Scale Company; Charles G. Neale, commissioner of weights and measures for the state of Minnesota; and Dr. Fritz Reichmann, formerly state superintendent of weights and measures for the state of New York, now at the head of the service department of the Fairbanks Company of New York. Hem and Neale explained the various parts of an automatic computing scale, and pointed out those parts on the scale exhibits mentioned above. Neither testified as to the value, mechanically, commercially, or otherwise, of the separate parts. Dr. Reichmann went more into detail, explained the parts of an automatic computing scale, giving the relative importance from a mechanical and also from an economic standpoint of the different parts in per cent. figures as follows:

From a mechanical standpoint: (1) Counterforce system 50 per cent.; (2) base and lever system, 25 per cent.; (3) connection between counterforce system and indicating mechanism, 2 per cent; (4) dash pot, 5 per cent.; (5) shock absorber, 2 per cent.; (6) mounting for indicating device, 5 per cent.; (7) leveling device, 5 per cent.; (8) particular form of indicating device, 2 per cent.; (9) method of arranging figures on indicating device, 2 per cent.; (10) arrangement of openings to facilitate readings of such figures by dealer and customer, 2 per cent.; making up a total of 100 per cent.

From an economic standpoint: (1) Signs appearing on scale, 5 per cent.; (2) housing of scale, 10 per cent.; (3) lever system and combination of a platform and indicating scale, robust appearance and color, 20 per cent.; leveling device, 5 per cent.; dash pot and shock absorber, 5 per cent.; divisions

on particular chart used, 2 per cent.; openings with correct reference marks on customer's and dealer's side for reading figures, 2 per cent.; particular form of indicating device, 2 per cent.; counterforce system, 49 per cent.; making up a total of 100 per cent.

Dr. Reichman explained the necessary parts of a complete automatic computing scale, without regard to whether it was of the cylinder, cone, dial, or disc variety. He dealt with physical parts of a scale, and made no distinction between the different kinds of indicating devices, or between different devices of the same general kind, but of different construction, such as light and heavy cylinders. He wholly disregarded the question as to whether any of the parts were covered by patents, combination or otherwise, and did not take the patent in suit into account at all in assigning a value, mechanical or economic, to the indicating device or cylinder to which the patent applies. This may account for his conclusion that the importance of that part of the scale covered by the patent is but 2 per cent. of the whole. The calculations made by Dr. Reichmann as to the relative values of the different parts of a complete machine without considering the value of a patent on one of the essential parts is not helpful in an effort to determine whether all or only a portion of the profits on the sales of the completed scales is due to such patent.

The Toledo Company advertised the infringing scale extensively, principally by circulars distributed to the purchasing public. These circulars called attention pointedly to the features of the scale, that the company claims make it superior to all others, particularly that the defendant's scale contains no springs, but is of the pendulum variety. On this feature of its scale defendant predicates its slogan, "No Springs—Honest Weight." The defendant did not in its advertising literature mention the light drum, the feature of the Smith patent. What effect such advertising had on sales is not known. No evidence was offered on that question.

The evidence considered in this division of the report is the only evidence in the case bearing directly on the question of a division of profits. It is not sufficient, as I view it, especially when read in connection with the decision of the Circuit Court of Appeals, relating to the character and scope of the patent and its far-reaching effect in the computing scale art, to establish that any portion of the profits is due to causes other than the patent.

### Findings of Law.

I find the law of the case to be that the plaintiff is entitled to a decree against the defendant for $104,101.97, the profits made by the defendant company on the manufacture and sale of the infringing scale.

Most of the questions involved in this case are disposed of as questions of fact, or are covered by elementary principles of law.

There were 1,839 cylinder scales, manufactured during the infringing period, on hand at the close of the period. Plaintiff contends that in these scales a profit inhered that was afterwards realized, and that the plaintiff is entitled to recover in this accounting as profits an amount per scale equal to the average profit per scale realized on the sale of the same kind of scales during the infringing period. No evidence was introduced as to market conditions prevailing after the close of the infringing period. Conditions may have been such that no profit at all was made on scales sold after the patent expired. Recoverable profits in accounting cases are profits actually realized; potential or prospective profits cannot be recovered.

In the account as stated cylinder scales have been made to bear overhead expenses on a proportion basis. The Toledo Company had an established plant and business, and was selling fan scales at the time it began to make and sell the infringing scale, and the plaintiff contends there should only be charged against cylinder scales such expense as the evidence may show was added on account of the cylinder scale business. The rule laid down in the Tremolo patent Case, 23 Wall. 518, 23 L. Ed. 97, seems just and equitable as applied to the facts in this case, and has been adopted.

The plaintiff contends that in view of the facts and circumstances, and especially that the defendant has been allowed 5 per cent. interest on its capi-

tal invested, the plaintiff should be allowed in this accounting the value of the good will built up on cylinder scales during the infringing period. The good will of a business built up by an infringer is a gain or advantage, but not a profit, and its value cannot be recovered as profits. This suit has proceeded on the theory of recovering profits; besides there is no evidence as to the value of the good will, and none upon which a finding in money value could be based.

The defendant urges that the evidence brings this case within division "d," paragraph 1, of Westinghouse v. Wagner, 225 U. S. 604, 614, 32 Sup. Ct. 691, 56 L. Ed. 1222, 41 L. R. A. (N. S.) 653; that, as it appears from the evidence a part only of the profits was due to the patent, the burden of proof rested on the plaintiff to show that the entire marketable value of the scale is attributable to the patented feature, or to give evidence tending to segregate profits between the patented and unpatented features, or to show that by reason of intermingling the profits cannot be apportioned; that the plaintiff has not sustained this burden, and is not entitled to recover more than a nominal sum. This contention is disposed of, so far as the master is concerned, by the finding of fact to the effect that the evidence, when read in connection with the decision of the Circuit Court of Appeals, is not sufficient to establish that any portion of the profits made is due to causes other than the patent.

It is a cardinal rule of patent law that, where a patent produces but a part of the profits, the plaintiff may recover only such part of the profits as the patent produces, and the defendant may have credit for the remainder, and this rule holds good in cases where the patented part is so connected with other essential parts of the machine that, if removed and nothing substituted in its place, what remains will not be a complete or workable machine, as well as in cases where the patented portion is separable, and when separated leaves the remainder a complete workable machine. Westinghouse v. Wagner, 225 U. S. 604, 32 Sup. Ct. 691, 56 L. Ed. 1222, 41 L. R. A. (N. S.) 653; Dowagiac v. Minnesota, 235 U. S. 641, 35 Sup. Ct. 221, 59 L. Ed. 398; Herman v. Youngstown Co., 216 Fed. 607, 132 C. C. A. 608; Dunn v. Standard Co., 204 Fed. 617, 123 C. C. A. 111; Robbins v. Illinois Watch Co., 81 Fed. 958, 27 C. C. A. 21.

The cases cited above are cases in which a separation of the patented from the other parts would not leave a complete machine. It is too well settled to cite authorities that if the patent part of a machine be removed, and what remains is a complete workable machine, segregation of profits should be made.

In reaching conclusions as to segregation the decision of the Circuit Court of Appeals in this case (208 Fed. 410, 125 C. C. A. 622) is controlling, and what is said there is binding on the master. Crosby Valve Co. v. Safety Valve Co., 141 U. S. 441, 447, 12 Sup. Ct. 49, 35 L. Ed. 809.

It was urged by counsel for defendant that claims 5 and 6 of the Smith patent in suit were not combination claims, and that Smith himself had designated his invention as an improvement, that cylinder scales had been made and used prior to Smith's patent, and that what Smith did was simply to improve the cylinder, by making it very light. It is a complete answer to this contention that it appears from the decision itself the Circuit Court of Appeals was not unmindful of what Smith said in his claims and other patent papers, or of the fact that Smith was not the first to use cylinder drums in computing scales.

It is not contended that claims 5 and 6 are combination claims, that Smith obtained a patent on every element of every computing scale in which the patent invention might be used; but it is contended—and this contention is borne out by the decision—that Smith alone had the right to connect his patented part with any weighing mechanism, and that Smith's patent covered the cylinder drum in connection with any weighing mechanism.

It does not follow that, because a patent covers a mere improvement, profits must necessarily be segregated. Whether they shall or shall not depends upon the nature and character of the improvement itself, and it may be that an improvement will be of such a character as to produce a new result and be the cause of producing all of the profits. In this case Smith invented the first usable automatic computing scale; he brought about a new result, and

became entitled to all of the profits, regardless of how he may have designated his invention in his patent papers. An inventor is entitled to the full benefit of what he actually invents, whether he sees fit to call it an improvement or to call it something else. The courts have recognized that a mere improvement or attachment is one thing, and that an improved machine that produces a new result is another thing.

This case comes within division a of paragraph 1 of the Westinghouse Case.

John M. Zane, of Chicago, Ill., for plaintiff appellant.

Edward Rector, of Chicago, Ill., and Frederick P. Fish, of New York City, for defendant.

Before BAKER, ALSCHULER, and EVANS, Circuit Judges.

BAKER, Circuit Judge (after stating the facts as above). From this and many other cases we get the impression that patent lawyers are quite generally possessed of the belief that a patent infringement bill in equity, to stop future trespasses and to make the defendant pay for past trespasses, is sui generis. As this is counter to the conception of equity jurisprudence which we entertain, and which lies at the root of many reasons given in the present decision, we proceed first to state briefly that conception.

[1] Property may be classified as real or personal or mixed, and as tangible or intangible. But the right in property of all classes is one, and consists ultimately of this, and only this—the right to exclude others. When a new element in the material world was discovered, radium, for instance, the possessing owner became entitled to the same rights and remedies that belonged to owners of previously known property. When the government created a new right in land in homesteaders, no statutory command was needed to open the door of equity to receive the homesteader's bill to stop future trespasses, and to make the defendant pay for past trespasses. It would have taken a statutory prohibition to warrant the court in keeping him out. When the government, fulfilling the intent of the founders, granted to inventors a new right of property in their inventions, no statutory command was needed to open the door of equity to receive the patentee's bill to stop future trespasses, and to make the defendant pay for past trespasses. It would have taken a statutory prohibition to keep him out; and a statute, stating that he may ask for an injunction and an accounting of profits and damages, should be construed simply as an affirmation of the pre-existing principles of equity.

So all bills for injunction are to vindicate the one fundamental concept of property, the right to exclude others. When the chancellor has found that the complainant has title, that he is possessed of the right to exclude the defendant, that the defendant has committed repeated trespasses, and that the defendant, unless enjoined, will continue (the defendant's state of mind can be proven only by the circumstances of his past trespasses unless he has admitted his intent), the decree of permanent injunction is the only adequate remedy, it exhausts all the equities of the bill, and it is final in its essence. It would also be final in time, were it not that usually there is a legal appendage to the bill. Complainant's demand that he be made whole on account of past tres-

passes, if it stood alone, would have to be followed at law. But equity, having properly taken jurisdiction, draws to itself all other controversies arising from the same transactions, even if legal in their nature, and will not send the complainant to the law side to get his money judgment for past trespasses. And in rendering the equitable decree on the merits the chancellor has heard all the evidence and found all the facts that are necessary for the money decree except the amount.

In making the defendant pay, an accounting of the defendant's profits is not peculiar to the patent infringement suit. If the homesteader sues his neighbor to stop the cutting down and carrying away of trees, he is entitled, after obtaining his permanent injunction, to show that the defendant sold a tree for $100, that his expenses were $25, and that his net profit was therefore $75. As against the trespasser, who is a trustee ex maleficio, $75 is the true value of the appropriated property, although the owner might not have been able to get more than $50 from any one else. If $50 is the true valuation, and if the defendant has realized only $25 net profit, then the defendant must turn over his profit, and also pay an additional $25. And if what is left of the domain has been damaged by the removal of the trees, the complainant, on proper proofs, is entitled to additional compensation. All these are means for measuring the total damage. The problem is always the same—to state in terms of money the results of the trespasses.

While the principles in the injunctional branch of equity are uniform, the practice in the patent infringement suit has been disparate.

Under the old rules, the court in reaching the permanent injunction was helpless to control the proofs. Depositions were loaded with hearsay, with immeasurable masses of irrelevant matter, with controversies of counsel, with counsel's directions to witnesses not to answer, with experts' analyses of hundreds of prior patents, when six would have been more than enough, with experts' interlarding of their opinions of facts with their opinions of the law of the case, etc. We conjecture that in our clerk's vaults there are tons of paper which were pure waste. We leave it at conjecture, because we have no computing scales on which to weigh the more important matters, the clients' exhaustion of patience and resources, the lawyers' mutual infliction of unnecessary labors, and the efforts of the courts to find the three grains of wheat in the bushel of chaff. But those evils are gone. Under the new rules, when the chancellor hears a patent suit, as he does other injunction suits in open court, he can and does control the proofs, exclude hearsay and irrelevancies, restrain counsel, compel witnesses to answer proper questions, limit the number of prior patents, and bridle the experts. Records on appeals now show the gratifying difference.

But when it comes to rendering the money decree on a master's report, with attached evidence, counsel seem to be yet at large. Frequently they toy with the master pretty much as they did with the notaries before whom they took the depositions for use at the hearing of the merits of the bill. In the present case our finding on the merits of the patent and the fact of infringement was made in 1913, and the District Court's finding of complainant's title to the patent, the only question concerning the merits of the bill left open on remandment, was

made in 1914; but the money decree was not entered till 1919, and the review here was not ready for presentation until the current year. Imagine a law court, with the single issue before it of damages for established or conceded trespasses, or the value of property wrongfully appropriated, or the value of property about to be lawfully appropriated (a condemnation case), permitting the parties to engage the attention of a jury for five years. We are not noting this case as being exceptionally Jarndyce; we are merely taking it as a text in speaking of a general situation.

[2] In our judgment the Westinghouse Case, 225 U. S. 604, 32 Sup. Ct. 691, 56 L. Ed. 1222, 41 L. R. A. (N. S.) 653, should forever extinguish in the minds of infringers, caught and held by a decree on the merits, the hope, long entertained and theretofore frequently availed of with success, of escaping all but nominal damages by commingling the appropriated property with other property, by hiding, or by drawing herrings across the trail. Equity will pursue an infringer of a patent as vigilantly as it will any other trespasser. And the first fruits of the Westinghouse decision should be this: If a manufacturer, knowing of a patent, decides to chance an unlicensed use, he should realize that he may be caught by a final decree on the merits and be ordered to respond accordingly; and, so realizing, he should be held to the duty of keeping separate and accurate records of all his infringing acts; and, on his failure to keep such records, the court, in measuring the damages on account of his trespasses, should resolve all doubts against him.

[3-6] New equity rule 63, we have no doubt, was intended to end the evils in reaching the money decree as completely as other new rules have ended the evils in reaching the merits decree. But if evils persist which cannot be remedied by the rigid enforcement of rule 63, then, pending possible supplements to that rule, we believe that the chancellor, either in open court or through explicit directions to the master in order to simplify and expedite the hearing, has power to employ methods not inconsistent with promulgated rules. If a defendant, his struggles over the merits being at an end, states his profits from the records contemplated in the preceding paragraph, the complainant (omitting for the moment any question of apportioning the profits between patented and unpatented parts) should be compelled to accept the statement as the measure of the money decree, unless he is prepared forthwith to allege and prove either (1) that the account was falsely stated or (2) that the profits, if truly stated, are not an adequate measure of the complainant's damages. If the first ground is sustained, the chancellor, either directly or through the master, might well appoint and qualify a competent and disinterested accountant to cure the defendant's default, and the report of the accountant should stand unless promptly impeached for fraud or gross inaccuracy. If the complainant should take the second ground, he might well be required to prove the value of the appropriated property as other such issues are tried by the opinion testimony of experts qualified to speak of the value of the invention. And neither "established royalty" nor "reasonable royalty," as evidence of the value of the invention, would be necessarily the limit

of value, for an infringer should not be allowed the profit which a li-. censee justly expects.

[7] If a defendant satisfactorily states his profits from the infringing device, but contends that only a part thereof is attributable to the invention, he might well be required to allege in his account, taken as a verified pleading, the grounds on which he claims apportionment of profits, and his proofs should be limited to the averments.

Against this general background we proceed to view the assignments of error.

I. Defendant's contention that all the decrees should be reversed, and the bill dismissed, on account of complainant's alleged failure to prove title to the patent, is overruled.

[8] A. Proof and finding of title constituted the base of the merits decree of 1914. No appeal was ever taken, unless the merits decree was carried along by the present appeal from the money decree. In our judgment the merits decree was final in its essence. National Brake & Electric Co. v. Christensen, 258 Fed. 880, 169 C. C. A. 600; same case, 254 U. S. 425, 41 Sup. Ct. 154, 65 L. Ed. 341; same case (decided herewith) 278 Fed. 490. But, assuming that defendant's position is correct, that the seven years old merits decree is now open to assault in this court because it was not the last step in the suit, we find:

[9] B. In 1895 the franchise was granted. It expired in 1912. During defendant's infringement, complainant was in open, notorious, adverse, exclusive, and continuous possession of the franchise. Before 1912 and ever since complainant has been in like possession of the present cause of action. As the patent expired in 1912, no one now can interfere with defendant's manufacture of cylinder scales. As infringement ended in 1912, the statute of limitation protects defendant from being called on to pay damages to third parties. For its established trespasses we think defendant ought to pay some one; and no one is at hand but complainant.

[10] C. We remanded the case in 1913 for proof of title because the execution of assignments from the Smith Company to the Boston Company and from the Boston Company to complainant had not been proven, and defective acknowledgments prevented certified copies of the Patent Office records from being taken in lieu. Proofs of the execution of the Boston Company's assignment seem abundant and regular. As to the Smith Company's assignment, the proofs show that all the stock was then owned by Bell and Luce, and they executed the assignment in the name and on behalf of the Smith Company. Whether there was a duly elected and acting board of directors, and proper officers, and due authorization by the directors for the officers to execute the instrument, are immaterial questions so far as defendant is concerned. An assignment in the name and on behalf of a corporation by all of its stockholders would convey at least a full equitable title.

II. Respecting the insistence that, on the proofs offered to the master and embodied in the record concerning Phinney's commercial practice as an anticipation, we should reverse our denial of defendant's 1913 petition to reopen the case on the merits, should reverse our precedent decree upholding the validity of the patent and should reverse the Dis-

trict Court's decrees of 1914 and 1919 with the direction to dismiss the bill, we say:

A. If it be regarded as a demand to interpose a defense of invalidity as a matter of right because validity has not yet been adjudicated, our conception of the nature of the merits decree leads us to reject the demand.

[11] B. If it be regarded as a petition in the nature of a bill of review, appealing to equitable discretion, then defendant's delay of eight years in presenting to us its bill of review to open our 1913 dismissal of its former bill of review on the same grounds inclines us to stay our hands.

III. Defendant says that the master's report of $400,000 profits from cylinder scales is an inescapable and self-evident blunder, because defendant's profits on its entire business during the infringing period from October, 1906, to September, 1912, were only one-fourth of that amount.

A. There is no reliable basis in the record for finding that defendant's entire net profits were only one-fourth of the master's award. In fact, as will more fully appear hereinafter, defendant never performed its duty, which arose at the end of its struggles on validity and infringement, of accepting the merits decree and making a full, frank, and accurate report of its infringement doings. But—

[12] B. Defendant's claim of error involves this fallacy: In a business comprising several branches, it is invariably true that each branch makes a profit; or, if it be deemed possible that a noninfringing branch should suffer a loss, then the profits from the infringing branch should first be applied to covering that loss.

IV. Under an order to file a full, frank, and accurate account in compliance with equity rule 63, defendant, by its auditor, Zolg, limited itself to the period from March 8, 1911, to August 31, 1912. This account was false in that it included only the cash part of sales in which secondhands were taken as part payment. But the master rejected the account, principally because he would not accept the contention, now repeated here, that defendant was free to use cylinder scales in which the spiders of the cylinders were made of steel. March 8, 1911, was the date on which defendant claimed that it began to make aluminum spiders for cylinders.

[13] A. Claim 5 covered a cylinder frame "of light material"; claim 6, "of aluminum." Both claims were alleged in the bill, and found in the merits decree, to be infringed. Aluminum frames infringed claim 6. Infringement of claim 5, unless we were in error in not finding that claim to be a mere duplicate of claim 6, could only arise from the use of material other than aluminum. Whether such material, as used, was sufficiently light to secure the benefits of the invention, was a question to be threshed out and settled at the final hearing on the merits.

[14] B. If the question is open, we go back eight years to the original record, and find that defendant's contention is a play upon the disparity of specific gravities. In view of Smith's disclosure in 1895, it was not difficult for defendant in 1906 to use steel so thin that the

cylinders were of such "lightness" as to fill perfectly the function of the cylinder in the complete weighing machine. In the hair spring of a watch the specific gravity of steel is immaterial. At the hearing of the merits appeal the exhibit before us had a cylinder with a steel frame. If defendant is right in its present insistence, then Auditor Zolg did wrong in including, after March 8, 1911, steel frame cylinders as indiscriminable equivalents of aluminum frame cylinders.

V. Defendant's principal assault upon the master's finding of profits on cylinder scales is directed to his aceptance of Zolg's figures on manufacturing cost. Defendant, after taking more than five months to prepare, filed Zolg's verified statement of manufacturing cost of cylinder scales from March, 1911, to September, 1912; and the master found that "the cost of labor and material did not vary materially during the accounting period, and it is therefore safe to apply Zolg's costs for 1911 and 1912 to the remainder of the period."

[15] A. Defendant never complied with equity rule 63. For this inequitable attitude, defendant might well be held in default, and, as other defaulters, to have forfeited the right to be heard until the default was set aside and a meritorious answer submitted. And the fact that the master and complainant took it upon themselves to state the account did not legally cancel the default.

[16] B. Complainant accepted and acted on Zolg's figures of labor and material costs, and thereupon employed Marwick-Mitchell, chartered accountants, to examine defendant's books and records, and therefrom to report all the other elements necessary to a just accounting, such as manufacturing overhead, office overhead, selling expense, number of scales sold, gross and net sales, etc. After complainant's accountants had filed Exhibit 40, defendant employed Price-Waterhouse, chartered accountants. They did not examine the books and records for the accounting period, as they might have done. They confined their examination to 1911, and reported a theory by which Auditor Zolg's figures on labor and material from March, 1911, to September, 1912, would be erroneous. They did not cover even the whole of Zolg's period. In preparing to discredit Zolg, they "attempted to reform the books of the Toledo Company as to the year 1911, and the calculations made by them and the results given are not based on the figures as they were entered on the books of the Toledo Company, but from figures that in their opinion should have been entered." Having thus shown that Zolg's figures of labor and material cost were wrong, they were ready to prove that Marwick-Mitchell were necessarily wrong. Defendant's default was not cured by such procedure. On the other hand, Marwick-Mitchell's account was a complete supplement to Zolg's account, and the two together covered the whole situation.

C. The master looked into the eyes and heard the voices of Zolg, Marwick-Mitchell, and Price-Waterhouse. Intelligence and credibility of witnesses were involved.

[17] D. Evidently from what occurred before him at the hearing the master found that the Price-Waterhouse calculations "were practically all abandoned on the hearing before the master, and the figures

disclosed in Exhibit 40, as changed and corrected on the hearing, were in the main acquiesced in by the Toledo Company." Employment of new or additional counsel cannot reinstate a matter that has been waived in open court.

[18-21] VI. On the master's finding and on the state of the evidence, rejection of defendant's claimed allowances for expenses of litigation and of maintaining an experimental department and taking out patents, was right. The master was not compelled to substitute guesswork for defendant's failure of proof.

VII. Confirming, as we do, the District Court's confirmation of the master's report of profits on cylinder scales, there remains the alleged error in awarding all the profits to complainant.

Claims 5 and 6 covered Smith's invention of an indicating cylinder for use in association with (and in that sense, in combination with) any weighing mechanism, so that the whole should constitute an automatic computing scale. It is immaterial that the claims are not combination claims, as "combination" is used in patent law vernacular. If they were, the question would be the same: Of what did Smith's invention consist, and what did it contribute to the weighing art? In deciding the merits in 1913, we held that Smith's invention resulted in "the first usable automatic computing scale."

In the Westinghouse Case it was held:

"(a) Where the infringer has sold or used a patented article, the plaintiff is entitled to recover all of the profits. * * *

"(d) But there are many cases in which the plaintiff's patent is only a part of the machine and creates only a part of the profits. * * * In such case * * * he must show, by equally reliable and satisfactory evidence, that the profits and damages are to be calculated on the whole machine, for the reason that the entire value of the whole machine, as a marketable article, is properly and legally attributable to the patented feature."

A. From our finding that Smith produced the first usable automatic computing scale, the master may be right in holding that this case comes within division (a) of the Westinghouse Case, in spite of defendant's assertion of the absurdity of it, based on the illustration of allowing all the profit on a steam-engine to the inventor of the governor. If theretofore the steam engine had raced and racked itself to pieces, so that commercially it was not a successful producer of power, then the inventor of the governor might be held to have created the first commercially successful steam engine, though there were in existence at the time other commercially successful producers of power; and though prior to Smith's time there were many classes of commercially successful scales, Smith originated a new class, the first usable automatic computing scale.

[22] B. But it is not necessary to let the case rest on division (a). From the master's elaborate account, showing equal cost of fan scales and cylinder scales, diminishing prices for fan scales, increasing prices for cylinder scales (indicating a stronger demand and readier sales), one can figure that the average difference in selling prices of the two types would account for all the profits on the cylinder scales, and thus demonstrate that the features common to the two types, such as electric lights to illuminate the readings of weight and price, created no

part of the profits on the cylinder scales, but that all were due to the distinguishing element, the cylinder. So division (d) of the Westinghouse decision likewise supports this case.

C. Defendant seeks to use its hereinbefore mentioned evidence of Phinney's commercial practice as a standard of comparison for apportioning the profits on the cylinder scales between the cylinder and the other parts. In its own factory defendant furnished a most excellent standard of comparison, in fact the best we have ever found in accounting cases. Its fan automatic computing scale was a later production than complainant's. The two types were virtually duplicates except fan and cylinder. They were made by the same machinery, the same labor, from a common stock of materials, and handled by the same supervising and selling staffs. In paragraph B of this section we have already made the comparison.

D. Defendant's failure to maintain any sort of cost accounting system, its commingling of the two businesses, its sales of fan scales and cylinder scales as intergers, without assigning any cost or any profit to any part of either, have made it impossible for us to reach any conclusion other than that adopted by the master as to the profits of defendant's business in cylinder scales and the award thereof to complainant.

In regard to complainant's assignments of error we find:

[23] I. Interest on investment is really the value of the use of defendant's manufacturing plant and selling facilities in making and selling cylinder scales. This credit item was apportioned by the master according to the relative volumes of fan and cylinder business. We find no substantial basis for recasting the master's figures. That such an allowance is a just credit against gross profits, see Western Glass Co. v. Schmertz Wire Glass Co., 226 Fed. 730, 141 C. C. A. 486 (7th C. C. A.), and Oehring v. Fox Typewriter Co., 251 Fed. 587, 163 C. C. A. 578 (2d C. C. A.).

[24] II. Defendant made profits on sales of cylinder scales in Canada. But no completed cylinder scale nor completed cylinder was ever shipped to Canada. Some parts were manufactured in Canada, and some were made here and shipped there; but the parts were there assembled into completed scales and there delivered to Canadian users.

Because some of the parts were made in this country, complainant insists that defendant is to be held here as a contributory infringing maker. But contributory infringement can only arise in this country when somewhere and somehow in this country there is a completed infringement to which a contribution can be made. Bullock Electric Co. v. Westinghouse Co., 129 Fed. 105, 63 C. C. A. 607.

[25] An additional urge is that defendant is liable as an infringing seller in this country because Canadian salesmen sent the orders of prospective Canadian users of the Canadian scales to defendant's office in Toledo for approval, and such orders were not filled from the Canadian plant until so approved. Complainant is doubtlessly right in saying that the contract was executed (but not in the sense of performed) in this country. It seems to us that complainant is confusing a sale with an executory contract for a sale. If complainant's position is correct, then a Canadian manufacturer, who made his goods only in

Canada, and parted with them only to Canadian users, would infringe a United States patent, if he should meet here a prospective Canadian user, and should enter into an executory contract to be performed in Canada.

[26] III. Respecting the master's disposition of secondhand scales, we reject complainant's proposition that, "when defendant sold an infringing scale at a fixed price in money, it must account for that price in money." If the "fixed price" was $150, and if defendant accepted in full payment $100 in money and a secondhand scale, then, although defendant in fact only realized $25 net from selling the secondhand, in an accounting of realized profits must defendant account for an additional $25 of profits that it did not realize?

[27] IV. At the end of the accounting period defendant had on hand 1,839 infringing scales. Undoubtedly this was an advantage to defendant and a damage to complainant as competitive makers and sellers of automatic computing scales. But the proofs before the master proceeded on the basis that all of complainant's damages would be satisfied by an award of defendant's profits from the infringement. Complainant did not prove, as it might well have done, the market conditions after the close of the infringing period or what defendant did with the 1,839 scales. We agree with the master that he was not required, on the state of the proofs, to speculate concerning potential or prospective profits. Robinson on Patents, § 1139 (note 2).

[28] V. At the end of the accounting period defendant possessed a going business in cylinder scales, and the making of cylinder scales was then free for all. But no manufacturer who had respected the patent would be in such an advantageous position. Complainant, as a manufacturer of its originally patented scale, would have a good start, and could probably maintain an easy lead over the law abiders. Defendant's advantages by means of its infringement, its organized plant, its trained mechanics and salesmen, its scales in process of manufacture, its stock of materials, and its accumulated impetus from past advertising, are obvious. Equally obvious is the damage to complainant (as a manufacturer, not as a patentee, who is entitled to exercise his right to exclude irrespective of his making the patented article) by having such a competitor unlawfully created. But, although infringement ended in 1912 and the matter of the money decree was not on until 1914, complainant came before the District Court and the master, not as a manufacturer that had been damaged as aforesaid, but solely as the owner of a franchise to exclude others from practicing the invention. And there was no evidence on which to make an assessment of such damages.

[29] Assuming that complainant might be able on remandment to prove substantial damages under heading IV or V, or both, does equity require that this case, based on a patent issued in 1895, be now opened in order to permit complainant to better its hold? Though defendant has been in default since 1914, we conceive that, if the case is to be opened at all, it should be opened for both parties; and the final result might be the present result, by defendant's being able to make a true showing of profits, which would be as much less than the master's

present award as the amount of damages complainant might be able to prove for leftover scales and good will. On the whole, we believe that the master has worked out substantial justice on the present record, and that the time has now come for ending the litigation.

The decree is affirmed.