PRODUCERS' & REFINERS' CORPORATION v. LEHMANN et al.

(Circuit Court of Appeals, Eighth Circuit. February 25, 1927.)

No. 7044.

1. Patents ⬡328—Barnickel, 1,223,659, covering process for separating oil content of roily oils by water softening agents, held not void for double patenting.

Barnickel patent, No. 1,223,659, covering process for breaking up roily oils and recovering the oil content as a commercial product by use of chemical water softening agents, held not the identical invention claimed by prior Barnickel patent, No. 1,093,098, covering metallic sulphate process of separating such oils, and patent was not void for double patenting, notwithstanding erroneous inclusion in its claims of soluble sulphate as water softening agent.

2. Patents ⬡328—Barnickel patent, No. 1,223,659, process patent for recovering oil content of roily oils held not void for uncertainty, because experimentation is necessary to determine composition of separating agent in each case.

Barnickel patent, No. 1,223,659, covering process for breaking up roily oils, by use of chemical water softening agents, held not void for uncertainty, in that it furnishes no formula for use of those practicing the process described, and that some experimentation will be necessary to determine composition of most effective water softening agent in any particular case.

3. Patents ⬡322—Denial of defendant's motion for re-reference in patent infringement suit, after master had reported findings, held not abuse of discretion.

Trial court's denial of defendant's motion to refer case back to master, with directions to require plaintiff to introduce proofs and sustain burden of establishing existence of amount of actual profits made by defendant as result of using infringing process, made after master had reported findings to court, held not abuse of discretion.

4. Patents ⬡318(5)—Allowance of interest from date of master's findings on amount found due plaintiff in patent infringement suit held not improper.

Allowance of interest from date of master's findings in patent infringement suit on amount found to be due plaintiff held not improper.

**5. Patents** ⟨⟩324(5⅝)—Master's findings on *conflicting evidence in patent infringement suit, concurred in by trial court, would not be disturbed on appeal.*

Findings of master on conflicting evidence in patent infringement suit, concurred in by trial court, would not be disturbed on appeal.

**6. Patents** ⟨⟩318(4¾)—Plaintiff held entitled to recover all profits realized by defendant on commingled oil sold during infringing period.

Plaintiff, suing for infringement of its patent covering process of recovering oil content of roily oils, is entitled to recover all profits realized by defendant on treated and untreated oil commingled and sold during infringing period, where defendant's sworn statement recited that no separate account of each had been kept.

**7. Patents** ⟨⟩322—Plaintiff, suing for patent infringement, held not entitled to resort to expert's estimates of defendant's production until it exhausted available records.

Plaintiff, suing for infringement of its patent covering process of recovering oil content of roily oils, was not justified in resorting to estimates of expert as to quantity of oil produced by defendant by use of infringing process, until he had at least attempted to secure information from defendant's records, or from records of pipe line companies, to which oil was sold, and which made records of daily deliveries of oil purchased by them.

**8. Evidence** ⟨⟩314(2)—Expert's estimates as to cost and expenses of producing oil by infringing process held not best evidence, and incompetent as hearsay.

Estimates of engineering expert as to cost and expenses of production, treatment, and sale of oil produced during infringing period by use of plaintiff's patented process, based on inspection of defendant's oil leases, observation of manner of operation, and statements by defendant's employees and officers, *held* not best evidence, but incompetent as hearsay.

**9. Patents** ⟨⟩324(5⅝)—Defendant's belated statement of account in patent infringement suit may be examined, to determine extent defendant was prejudiced by judgment on incompetent evidence.

Defendant's own statement of account in patent infringement suit, though belated, in that it was rendered on defendant's motion for a re-reference of accounting to master, after master had reported findings to court, may be examined to determine wherein and to what extent defendant was prejudiced by judgment against it, based on incompetent expert evidence, in order to avoid necessity of setting aside judgment.

**10. Patents** ⟨⟩324(1)—Defendant, failing to claim credit for certain items at hearing before master in patent infringement suit, held not entitled to assert them on appeal.

Defendant in patent infringement suit, having failed to claim credit for certain items in its statement of account or to offer proof in respect thereto on hearing before master, will not be allowed on appeal to say that master

erred in not allowing such items, or complain that it was not permitted to open case and prove their existence after case had been submitted to, and decided by, master.

**11. Patents** ⟨⟩318(3)—Credit for depreciation of oil reserves on defendant's leases held properly disallowed, where oil was valueless without infringing treatment.

Where oil taken from earth during infringing period was valueless without treatment by plaintiff's patented process, credit for depreciation of oil reserves on defendant's leases was properly disallowed on accounting.

**12. Patents** ⟨⟩318(5)—Interest on capital necessarily invested to produce profits by infringing process should be allowed in accounting for profits.

Interest on capital necessarily invested by defendant in oil leases and equipment solely to produce oil by infringing process should be allowed in accounting for profits.

**13. Patents** ⟨⟩322—Defendant's evidence as to quantity not treated by infringing process held properly disregarded, where defendant's previous sworn answer stated impossibility of furnishing such information.

Where defendant in suit for infringement of patented process of treating roily oil had made sworn statement on accounting that it was impossible to segregate the treated and untreated oil, because both had been mixed and no separate account of either had been kept, subsequent testimony of defendant's witnesses as to quantity of untreated oil produced during infringing period was properly disregarded.

**14. Patents** ⟨⟩322—Plaintiff must be given benefit of doubts as to dates of investments to produce infringing product as respects interest on defendant's investment.

Plaintiff, suing for infringement of process patent, must be given benefit of all doubts as to dates on which defendant's expenditures of capital invested solely to produce infringing product were made, as respects crediting defendant with interest thereon, since defendant could have made matter certain.

**15. Patents** ⟨⟩322—In making up account in patent infringement suit, master should have accepted testimony of defendant's witness as to defendant's expense account, rather than incompetent testimony of plaintiff.

In suit for infringement of process patent, *held*, that master, in making up account, should have accepted defendant's expense account as testified to by its auditor, rather than have used incompetent estimates of plaintiff's expert, though defendant's books were not offered in evidence, since defendant's evidence, whether incompetent or not, amounted to admissions against interest.

Appeal from the District Court of the United States for the District of Wyoming.

Suit by Sears Lehmann and another, as executors under the will of William S. Barnickel, deceased, and others, against the Producers' & Refiners' Corporation. Judgment

for plaintiffs, and defendant appeals. Modified and affirmed.

W. Clyde Jones, of Chicago, Ill. (Charles F. Carnine, of Denver, Colo., William J. Dowd, Arthur A. Olson, and A. Arnold Brand, all of Chicago, Ill., and William E. Mullen, of Cheyenne, Wyo., on the brief), for appellant.

Paul Bakewell, of St. Louis, Mo. (Roderick N. Matson, of Cheyenne, Wyo., on the brief), for appellees.

Before SANBORN, Circuit Judge, and MUNGER and JOHNSON, District Judges.

JOHNSON, District Judge. The Producers' & Refiners' Corporation has appealed from the decree of the court below, adjudging it an infringer of patent No. 1,223,659, issued April 24, 1917, to William S. Barnickel, now deceased, and also from the judgment on the accounting for profits in the sum of $290,895.24 in favor of the administrators of said deceased.

[1] The first contention of appellant to be considered is that the patent adjudged infringed is void for double patenting. On April 14, 1914, patent No. 1,093,098 was issued to said William S. Barnickel. It is alleged in the answer and claimed by appellant on this appeal that "said patent No. 1,223,659 covers in its claims the identical alleged invention claimed in said patent No. 1,093,098, and thereby said patent No. 1,223,659 attempts to prolong the monopoly beyond the 17 years allowed by law, and said patent No. 1,223,659 was inadvertently issued, and is, and at all times has been, void for double patenting."

Each patent covers a process treatment for what is known in the mid-continent oil fields as cut or roily oil, sometimes called "b s," from "bottom settlings." Roily oil consists of oil and water and other matter so thoroughly and intimately mixed that they do not readily separate. Following is the history of the two patents mentioned in the answer:

In 1907, while visiting the oil fields of Oklahoma, Mr. Barnickel observed roily oil going to waste; some running down creeks, some being burned. In 1910 he observed roily oil being wasted in the Louisiana oil fields. He also observed that producers were treating this roily oil by heating it, and in that way separating the oil from the water and other foreign matter with which it had been mixed. Mr. Barnickel was a chemist, and made some experiments about this time in an attempt to work out a chemical treatment which would break up the emulsion and render the oil content a commercial product, but without success. In the fall of 1911 the Texas Company brought in a well producing 45,000 barrels per day of roily oil which could not be separated by any process of heating—the only known method of treatment at that time. At the request of the Texas Company Mr. Barnickel renewed his experiments with samples taken from this well and discovered that a very good separation resulted by mixing a small quantity of alum or copperas (which are metallic sulphates) with the roily oil.

The use of metallic sulphates for breaking up roily oils and recovering the oil content as a commercial product is the process covered by patent No. 1,093,098. Later Mr. Barnickel found that there were roily oils which would not yield to the sulphate treatment. After considerable experimentation with these refractory oils, he found that soap and other water softening agents would break up the roily oils found in the mid-continent oil fields. The use of water softening agents for breaking up roily oils and recovering the oil content as a commercial product is the process covered by patent No. 1,223,659, the patent found infringed. The chemicals covered by the first patent are metallic sulphates. The chemicals covered by the second patent, the one infringed, are the water softening agents in the claims designated—among which is soap. The difference in the reactions of the chemicals covered by the patents is clearly stated by the witness Keiser. He testified:

"In the first patent, where soluble metallic sulphate is added to the water, there is formed the iron carbonate and the lime and magnesium sulphate. These are soluble and stay in solution; the iron is precipitated. There is no reduction of the hardness of the water. In the second patent, where the water is treated with a soluble water softening agent, such as sodium carbonate or soap, which is sodium oleate, there is formed calcium and magnesium carbonates, which are insoluble and are thrown down as calcium and magnesium oleates, which are precipitated and removed, and there stays in solution sodium sulphate. In the second case there is an actual removal of the lime and magnesia, whereas in the first place there is not, so that the second is water softening and the first one is not."

He testified that metallic sulphates clarify, but do not soften, water. In this connection he said:

"The lime and magnesia in the water are not diminished; in fact, they remain the same, and the iron, being precipitated as flocculent

precipitate, drags down the suspended maturities (impurities) and clarifies the water."

Much is made by appellant of the fact that Mr. Barnickel, in claims 2 and 4 of the patent found infringed, named "a soluble sulphate," among other chemicals, as a water softening agent. The evidence showed that "a soluble sulphate" is not, when used alone, a water softening agent. It is urged that plaintiff is bound by the statement made in the claims of the second patent that "a soluble sulphate" (which includes metallic sulphates covered by the first patent) is a water softening agent, and that he may not now, for the purpose of avoiding the defense of double patenting, prove that "a soluble sulphate" is not a water softening agent; that is to say, it is contended that he may not now prove that the metallic sulphates covered by the first patent are not water softening agents. In the specification of the second patent the state of the prior art is given in some detail, and among other things it is stated that:

"It has also been known * * * that soluble sulphates in relatively small quantities would serve to separate petroleum from the roily oil and bottom settlings obtained in some localities. * * * My present process, briefly described, consists in treating bottom settlings, roily oil, or any other natural oils or residues from the same or a similar nature, with an agent which partially or completely removes the hardness of the water contained in the bottom settlings or roily oil, by decomposing the salts of lime and magnesia which are held in solution in the water, and thereby softening the water or brine, which agent will hereinafter be referred to as a water softening agent, thus changing the composition of the mineral salts and isolating the foreign organic matter and leaving the oil free to separate from the water and foreign matter in the natural way, by gravity."

It is apparent from the specification and claims of the second patent that the process claimed by the patentee was based upon the use of water softening agents. The inclusion of "a soluble sulphate" among the chemicals listed as water softening agents did not make it so, and conceding the patent to be too broad or void, so far as "a soluble sulphate" used alone is concerned, it does not make out a case of double patenting or render the patent void with respect to the use of actual water softening agents covered by the patent. Without pursuing this inquiry further we think the trial court did not err in overruling the defense of double patenting.

[2] It is urged in the second place that the patent is void for uncertainty, in that it furnishes no formula for the use of those practicing the process described in the patent. There is no plea of insufficient disclosure in the answer; but, assuming that this question may be raised, because appearing, as it is claimed by appellant, upon the face of the patent and from the testimony of Mr. Barnickel himself, we think the contention without merit. In the nature of things, for no two oils will be exactly the same, some experimentation will be necessary to determine the composition of the most effective water softening agent in any particular case. The patent in question is a process one and in our judgment falls within the rule laid down by the Supreme Court of the United States in the case of Minerals Separation, Ltd., v. Hyde, 242 U. S. 261, 37 S. Ct. 82, 61 L. Ed. 286, where it is said:

"Equally untenable is the claim that the patent is invalid for the reason that the evidence shows that when different ores are treated preliminary tests must be made to determine the amount of oil and the extent of agitation necessary in order to obtain the best results. Such variation of treatment must be within the scope of the claims, and the certainty which the law requires in patents is not greater than is reasonable, having regard to their subject-matter. The composition of ores varies infinitely, each one presenting its special problem, and it is obviously impossible to specify in a patent the precise treatment which would be most successful and economical in each case. The process is one for dealing with a large class of substances and the range of treatment within the terms of the claims, while leaving something to the skill of persons applying the invention, is clearly sufficiently definite to guide those skilled in the art to its successful application, as the evidence abundantly shows. This satisfies the law."

In 1916 Mr. Barnickel began the manufacture of a water softening agent, in the nature of a soap, which he called Tret-o-Lite, and which after considerable experimentation he had found would successfully break up at the relatively low temperature of about 110° Fahrenheit most of the roily oils of the mid-continent oil fields. He had previously found that a soap manufactured by Fairbanks & Co., known as "Gold Dust" or "Goldine," would also successfully break up a great many of these roily oils at a temperature of about 180° Fahrenheit. Gold Dust or Goldine was not entirely satisfactory, because of the loss, on account of the temperature re-

quired, of some of the more volatile constituents of the oil. However, Gold Dust or Goldine falls within the category of water softening agents covered by the patent, as the temperature specified in the patent for practicing the process covered by the patent is stated as ranging from 110° to 200° Fahrenheit. Mr. Barnickel sold his product, Tret-o-Lite, to producers with the privilege or license to use it in the treatment of their roily oils.

At the time of the trial (1921) a large number of oil producers of the mid-west and south were using Mr. Barnickel's product for treating their roily oils. In May, 1919, appellant purchased from Mr. Barnickel a quantity of Tret-o-Lite and began to use it to treat roily oils then being produced by it from wells situated in Okmulgee county, Okl. In a short time appellant ceased the use of Tret-o-Lite, and began to use Gold Dust and Goldine instead. On July 1, 1919, Mr. Barnickel notified appellant by letter that it was infringing his patent by using Gold Dust and Goldine in the treatment of its roily oil. Appellant disregarded the notice, and continued the use of Gold Dust and Goldine to reduce its roily oils, until enjoined by decree of the court below, on May 2, 1921.

In the decree the court referred the cause to "T. Paul Wilcox, Esq., of the city of Cheyenne, state of Wyoming, on the record and proceedings already had in this case, including the transcript of the proofs taken in open court in this case and exhibits filed at the hearing, * * * and on such further proofs as may be taken before said T. Paul Wilcox, Esq., as master, said T. Paul Wilcox being hereby appointed pro hac vice to take and state the account of said gains, profits, and advantages, and to assess such damages and to report thereon with all convenient speed; and the defendant herein, Producers' & Refiners' Corporation, its directors [et al.], are hereby directed and ordered to attend before said master from time to time as required, and to produce before said master such books, papers, vouchers, and documents as may have any bearing upon the inquiry before said master, that may enable said master to ascertain either the gains, profits, or advantages which defendant has made by reason of said infringement, * * * and that said defendant, its officers [et al.], submit to such oral examination as the said master may require."

[3] There was a hearing before the master, after which he reported his findings to the trial court. The matter was heard by the trial court upon exceptions to the findings of the master and upon a motion of appellant, among other things, asking for a re-reference of the cause, "with directions to the master to require the plaintiff to introduce proofs and to sustain the burden of proof to establish the existence and the amount of actual profits which the defendant may have made as the result of its use of the infringing process, based upon the books and records of the defendant. * * *"

The motion was denied, and the exceptions to the findings of the master overruled, and judgment entered for the sum of $263,459.37, with interest from the date of the master's findings and report, in the sum of $27,435.87, as and for the profits of appellant resulting from the use of the process covered by the patent infringed.

[4] There was no abuse of discretion in the denial of appellant's motion to refer the case back to the master. Roemer v. Bernheim, 132 U. S. 103, 10 S. Ct. 12, 33 L. Ed. 277. And the allowance of interest on the principal sum from the date of the master's findings was not improper. Tilghman v. Proctor, 125 U. S. 136, 8 S. Ct. 894, 31 L. Ed. 664.

[5] The master found that the process covered by the Barnickel patent, No. 1,223,659, was the only known process by which the roily oils treated by appellant with Gold Dust during the infringing period could be broken up and the oil content made a commercial product. Appellant attacks this finding, and contends that the evidence shows that these roily oils could have been, and that some were, reduced and the oil content converted into a commercial product by use of the well-known and unpatented hot-water process, and it contends that the master and trial court should have used the hot-water process as a standard of comparison in determining the profits realized by appellant from the use of the patented process. There is evidence in the record that these roily oils could have been, and that some were, successfully treated by the hot-water process, but there is also evidence in the record that none of these oils were or could be successfully treated by the hot-water process. The evidence was conflicting. Both the master and the trial court have found against the contention of appellant. That finding this court will not disturb. Skelton v. Federal Surety Co. (C. C. A.) 15 F.(2d) 756; Houchin Sales Co. v. Angert (C. C. A.) 11 F.(2d) 115.

In this connection the contention of appellant that the trial court conceived itself to be concluded by the findings of the master, and that it failed to exercise an independent judg-

ment in passing upon the evidence, will be disposed of. This argument is based upon certain statements found in the written opinion of the trial court. Assuming that the question can be thus raised, it is without merit. The trial court in its opinion discusses at some length the weight to be given to the master's findings, which depend upon the credibility of witnesses. Upon that subject the trial court said:

"Some confusion has undoubtedly arisen in this circuit, in that the Circuit Court of Appeals, in the case of Westinghouse Elec. & Manf. Co. v. Wagner Elec. Mnf. Co., 281 F. 453, has seemingly applied the 'unassailable' doctrine to a case in which reference was made by the court in ordinary course without the consent of parties. This court is impressed with the thought that the dissenting opinion of Judge Hook in the Westinghouse Case, supra, more clearly expresses the general trend of authorities upon the subject; but in the face of the majority decision, which announces the rule for this circuit, little latitude is left to a trial court. I am satisfied that the report of the master should under any rule be given full faith and credit as being, if it so appears, the honest solution of the problem intrusted to the master's charge, and that it will receive in the case at bar."

Further on in the opinion, while discussing the testimony bearing upon the question of the availability of the hot-water process for reducing the roily oils treated by appellant during the infringing period the court said:

"From the examination of that portion of the testimony which has been called to the court's attention upon this phase of the controversy, I am inclined to believe that the master was justified in his conclusion that the steam and hot-water process was not of such a character in the treatment of the particular oil here in controversy, as would justify its acceptance by him as a recognized method to be used in comparison with the patented process or the infringing process."

Then, doubtless having the "unassailable" doctrine in mind, the court added: "At least it was one of the disputed questions of fact."

The finding of the master, concurred in by the trial court, that the roily oil treated by the appellant with Gold Dust during the infringing period was before treatment without value is clearly sustained by the evidence. This roily oil without treatment was not only without value; it was, when brought to the surface, a waste product to be gotten rid of. The amount realized from the sale of the com-

18 F.(2d)—32

mercial oil saved through treatment, less the proper costs and charges of production, treatment, and sale, was all clear gain, as the master and trial court found.

It is contended that plaintiff failed to prove by any competent evidence that appellant made any profits while using the infringing process. On June 1, 1921, at the request of the plaintiff, the master ordered appellant "under the oath of the officer of your company best advised in the premises, to bring in and file an account in respect to the infringement found in this case by the United States District Court for the District of Wyoming by its said decree of May 2, 1921, respecting the profits which defendant has made by reason of said infringement of claims 1, 2, 3, 4, 5, 7, 9, and 11, or any of said claims, of United States letters patent No. 1,223,659, dated April 24, 1917, for treatment of crude oil, to William S. Barnickel. To that end I hereby order you, on or before the 2d day of July, 1921, to file with me, under the oath of said officer of defendant corporation, a statement in writing as more specifically called for by clauses 1 to 13 hereof. * * * The said account that defendant is hereby ordered to render is as follows. * * *"

Then follows an enumeration, under 13 heads, of information to be given in the account, in substance as follows: (1) The amount of roily oil treated since the date of the patent by the use of Gold Dust or Goldine, or other water softening agent; (2) the location of the properties or leases where such oils were treated; (3) the quantity of treated oil sold; (4) the amount received for the same; (5) the amount of Gold Dust or Goldine, or other water softening agent, purchased for the treatment of roily oils, and (6) the cost of same; (7) the quantity of Gold Dust or Goldine, or other water softening agent, on hand; (8) the amount paid out for labor employed by it exclusively for and attributable to the treatment of said oils; (9) the amount paid for materials other than Gold Dust or Goldine, or other water-softening agent, other than Tret-o-Lite, and what such materials consisted of; (10) the amount of treated oil on hand, its market value, and where located; (11) the names and addresses of the purchasers of the treated oil; (12) the quantity of treated oil not on hand, and not accounted for under No. 3, which was refined or used as fuel, or for any other purpose, and the value of the same; (13) the names and addresses of those from whom Gold Dust, Goldine, and other water softening agents were purchased.

On July 12, 1921, appellant rendered a

so-called statement, sworn to by its vice president, in substance as follows: That it was impossible to give the information called for under query No. 1 submitted by the master, for the reason that the treated and untreated oils produced by appellant had been commingled and sold together, and no separate account of either had been kept. That it was impossible to give the information called for under queries 3 and 4, for the reasons stated in the answer to query No. 1. That it was impossible to give the information called for under queries 5 and 6, for the reason that the Gold Dust and Goldine purchased by it was used for other purposes than the treatment of roily oils, and no separate account had been kept. That it was impossible to give the information called for by query 8, as laborers employed in the treatment of roily oils worked generally on the leases, and no separate accounts had been kept. That it was impossible for like reasons to give the information called for by query 9. That it was impossible to give the information called for by query 12, as oil used for fuel had been taken from tanks of commingled oil. It was stated that none of the commingled oil had been refined. In answer to query No. 2, the names and working interest in three leases situated in Okmulgee county, Oklahoma, were given, which will be referred to as the G, J, and S leases. In answer to query No. 7 it was stated that the defendant had on hand 185½ barrels of Goldine and 1½ cases of lye. In answer to query No. 10 it was stated that appellant had no treated oil on hand. In answer to query No. 11 it was stated that the Cosden Pipe Line Company and the Texas Company were the purchasers of the commingled oil produced by appellant during the infringing period. In answer to query No. 13, the names and addresses of dealers were given from whom the Gold Dust and Goldine and other water-softening agents had been purchased. No further information was given, and no attempt was made to state either the debit or credit side of the account.

[6] No further action was taken by or had before the master until November 5, when the hearing on the accounting was set for November 21, 1921. At the beginning of the hearing before the master on November 21, plaintiff gave notice that, since the defendant had made default in rendering an account, he would proceed to state the account with the best evidence available. It was assumed by the plaintiff, and rightfully (Westinghouse Co. v. Wagner Mfg. Co., 225 U. S. 604, 32 S. Ct. 691, 56 L. Ed. 1222, 41 L. R. A. [N. S.]

653), that he was entitled to recover all the profits realized by appellant upon the commingled oil produced and sold during the infringement period from the three leases mentioned in its answer to query 2 of the order of the master hereinbefore referred to. To prove the amount of the commingled oil produced on leases S and G and the sum realized from the sale thereof, plaintiff introduced in evidence certified copies of the returns made by appellant to the auditor of the state of Oklahoma for the six quarters beginning with the quarter commencing July 1, 1919, and ending with the quarter from April 1, 1921, to June 30, 1921. For the statute under which these reports were made, see Bunn's Annotated Supplement to the Revised Laws of Oklahoma 1918, § 7469a, pp. 998–1000. These reports were sworn to in every case more than 20 days after the close of the quarter covered by them. It is a fair and reasonable inference from this fact, taken in connection with the evidence in the record, that the oil was delivered to the pipe line companies from the last of a number of treating tanks, each of only 250 barrel capacity, that the sums given in the reports as actual cash values represent the amounts actually received in cash by appellant from the pipe line companies for the oil produced during the quarters covered by the reports.

[7] The last report covers the time from and including May 3 to June 30, 1921, which is not within the period covered by the accounting. But it was possible to determine the actual quantity of oil produced and sold from April 1 to May 1 from a notation in the report for that quarter of a change in unit prices from $1.75 to $1.50 per barrel. It appeared from the testimony of the witness Wilrich that the unit prices listed in the reports were the current market prices of commercial oil during the time covered by the reports. He testified that the market price changed from $1.75 to $1.50 per barrel on May 2. The report gave the quantity of oil sold at $1.75 per barrel, which therefore represented the production from April 1 to and including May 1. From an average of the production before and after May 2, the witness Wilrich estimated the net production for that day on the S lease to be 22.75 barrels, of the market value of $34.12, and on the G lease to be 42 barrels, of the market value of $63.00. Unquestionably there was better evidence than these estimates available to the plaintiff. No effort was made by him to have appellant produce its books or other data from which this information might have been obtained. But,

even if it had not been possible to obtain the information from appellant's records, it is clear from the evidence that the pipe line companies to which this oil was sold made records of the daily deliveries of the oil purchased by them. It was on such records that settlements were made. Plaintiff was not justified in resorting to estimates of production for May 2 until he had at least exhausted these sources of proof. See cases cited below.

The oil produced and sold from the J lease was not taxable by the state, and the reports to the state auditor respecting that lease were incomplete. The witness Wilrich, as an expert, also made an estimate of the production of the J lease during the infringing period, but as the master determined the production of this lease from the testimony of the witness Koch, who was an employee of appellant and was called and testified as a witness in its behalf as to the production of the J lease during the infringing period, appellant has no just ground for complaint against this finding of the master.

[8] To arrive at the cost and expense of the production, treatment, and sale of the treated oil, which, as we have seen, includes all the oil produced during the infringing period upon the three leases, the plaintiff also introduced in evidence estimates prepared by the witness Wilrich as an engineering expert. These estimates were made by the witness after an inspection of the properties in question, and after observing the manner of operation upon the leases and from statements made by some of the employees and officers of appellant. The findings of the master were based upon these estimates as to the expenses and costs of production, treatment, and sale of the oil produced, treated, and sold during the infringing period.

Clearly these estimates were not the best evidence available to the plaintiff to prove these facts. The best available evidence of these matters presumably was the books of appellant; equally competent for the plaintiff would have been the testimony of the employees and officers of appellant acquainted at first hand with the facts. It is claimed that plaintiff was justified in resorting to this character of proof, because appellant had stated, in answer to the queries of the master, that it was impossible to give the information called for. But appellant did not say that it was impossible to give the information called for by the master for the total production of the leases during the infringing period. The defendant before the master and to the trial court strenuously insisted, and here insists, that the Wilrich estimates were incompetent; that the only competent evidence to prove the expenses, costs, and charges to be deducted from the gross profits was the books of the company, or the testimony of its officers and employees acquainted with the facts. In our opinion, the contention that plaintiff was not justified in resorting to estimates of costs and expenses based upon hearsay and the opinion of the witness, as was done in this case, is well taken and must be sustained. Tilghman v. Proctor, 125 U. S. 136, 8 S. Ct. 894, 31 L. Ed. 664; Keystone Mfg. Co. v. Adams, 151 U. S. 139, 14 S. Ct. 295, 38 L. Ed. 103; Westinghouse Co. v. Wagner Mfg. Co., 225 U. S. 604, 32 S. Ct. 691, 56 L. Ed. 1222, 41 L. R. A. (N. S.) 653.

[9] But it does not follow, as assumed by appellant, that the judgment on the accounting must be set aside and the suit dismissed, or the matter of the accounting sent back for retrial. There is, as we shall see, another alternative. Appellant overlooks the fact that it called witnesses at the hearing before the master, from whose testimony the account may be stated, and the fact that it did finally render a belated statement of the account. Attached to the motion of appellant for a rereference of the matter of the accounting filed in the court below there is a statement of the account, purporting to be made from appellant's books by an expert accountant, based upon the total production of the three leases during the infringing period and the cash realized from the sale of the oil produced. The statement also gives the costs and expenses of production, treatment, and sale, as shown by the books, of the oil produced, treated, and sold during the infringing period, as well as other charges claimed as credits, from all of which it is made to appear that appellant lost money on the three leases in question during the infringing period. This statement of the account, though belated, is in the record, and may be looked at for the purpose of seeing wherein and to what extent appellant, by its own showing, was prejudiced by the judgment entered against it on the accounting. According to this statement of the account appellant's interest in the total production of the three leases during the infringing period was 89,382.92 barrels, and the cash received from the sale of same amounted to $284,380.88. These totals are made up as follows:

S lease, 25,991 barrels .......... $ 74,007.43
G lease, 60,671.30 barrels ........ 202,637.50
J lease, 2,720.62 barrels ......... 7,735.95

The account of appellant's interest, as stated by the master from the reports to the state auditor for S and G leases, and from the testimony of the witness Koch for J lease, is as follows:

S lease, 33,459.52 barrels ........ $ 98,158.00
G lease, 61,317.27 barrels ........   203,352.71
J lease, 1,452.79 barrels .........     4,791.68

—making a total of 96,229.58 barrels and $306,302.39. It thus appears that the reports to the state auditor are in excess of the books from S lease, 7,468.52 barrels and $24,150.-57; G lease, 645.97 barrels and $715.21; but the books exceed the Koch statement for J lease by 1,267.83 barrels and $2,944.27. The excess of the reports to the state auditor and of the Koch statement combined over the books is 6,846.66 barrels and $21,921.51.

However, these discrepancies are readily accounted for on the face of the record. The accountant who prepared the statement of the account for appellant used the fraction $^{49}/_{128}$ to represent the interest of appellant in the gross production of S lease, while in the statement of the master based upon the reports to the state auditor the fraction $^{7}/_{16}$ was used. In addition there is a discrepancy in the gross production of S lease for the second quarter of 1920 between the two statements amounting to 8,715.92 barrels. In the statement of the accountant for appellant, the gross production for that quarter is given as 8,719.97 barrels. In the report for that quarter to the state auditor the gross production is given as 17,435.89 barrels, working interest .4375 per cent., price $3.50 per barrel.

If now the returns from S lease in appellant's account, representing a $^{49}/_{128}$ interest be changed to represent a $^{56}/_{128}$ interest we have 29,704.08 barrels and $84,579.88, instead of 25,991 barrels and $74,007.43. Adding to this seven-sixteenths or $^{56}/_{128}$ of 8,715.-92 barrels at $3.50 per barrel the account restated would be:

S lease, 33,517.26 barrels........ $ 97,926.00
G lease, 60,671.30 barrels........   202,637.51
J lease,  2,720.63 barrels........     7,735.95

Total 96,909.19 barrels........ $308,299.46

Appellant's statement of the account as thus corrected is greater than that of the master by 679.6 barrels and $1,997.07.

As already said, the reports made to the state auditor were competent evidence to prove the production during the infringing period, and, in connection with other evidence in the case, to prove also the cash receipts from the sale of the oil produced, treated, and sold during the infringing period. It is evident that appellant has no ground of complaint as to the debit side of the master's statement of the account, unless it appears that the master and trial court fell into error in respect to the two matters above mentioned. The report to the state auditor for the second quarter of 1920 for S lease reads as follows:

Total production—17,435.89 barrels.
Working interest—.4375%=7,628.20 barrels.
Unit price		—$3.50.
Cash value		—$26,661.98.
Royalty interest—.125%=2,179.49 barrels.

Appellant claims that this report is erroneous in respect to the total production and appellant's interest. The expert accountant, who prepared appellant's statement of the account, gives a plausible explanation as to how the supposed mistakes were made by the bookkeeper who prepared the report. But it appears that the bookkeeper who made the report was the same Mr. Koch whose statement of the total production of J lease was adopted by the master. He also testified as to the total production of S and G leases, giving the total production of S lease as 66,799.5 barrels. He does not explain the alleged mistakes in the report to the state auditor, and is not asked to do so. The master was fully justified in accepting the reports to the state auditor as better evidence of the production than the testimony of this witness, especially in view of the fact that the books and other written data from which he stated the production of the several leases was obtained were not put in evidence. An error in the report to the state auditor of 8,715.92 barrels in the gross production, amounting to $30,-505.72 as stated by the accountant, and of 8,-750.86 barrels in the gross production, amounting to $30,628 as shown by the testimony of the witness Koch, must have challenged the attention of appellant at the time the report was introduced in evidence, and its failure to have the witness Koch explain and correct the mistake, if there was a mistake, is inexcusable, whether the result of oversight or design, and the failure of appellant to have the witness Koch explain and correct the mistake—if there was a mistake—in the working interest of appellant in S lease which is stated in the report to be .4375, the equivalent of the fraction $^{7}/_{16}$ used in the master's findings to represent appellant's interest in S lease, is equally inexcusable. In no other of the reports to the state auditor is appellant's interest stated.

In answer to query 2 of the master appel-

lant gave the names of the leases called for and stated its interest in the leases to be:

"An undivided seven-sixteenths working interest in the S lease."

"The entire working interest in the G lease."

"An undivided one-half working interest in the J lease."

Then follows this explanation: "On each and all of the leases above described, one-eighth of the oil produced therefrom, or the value thereof, was distributed to the respective royalty holders."

Appellant claims that it only owned 7⁄16 of 14⁄16—that is 49⁄128—interest in the production from S lease. But the only evidence the master had upon which to determine the working interest of appellant was appellant's answer to query 2, the testimony of the witness Easton that appellant's interest in S lease was "a seven-sixteenths working interest," and the decimal fraction given in the report quoted above. The language of appellant and of the witness Easton, above quoted, when considered in connection with the express statement in the report to the auditor that its interest was .4375 fully justified the finding that such fraction represented appellant's interest in S lease.

As appellant's account, as stated by its accountant, when corrected to correspond in these particulars to the master's statement of the account, exceeds the latter by 679.6 barrels and $1,997.07, it is evident that the improper inclusion of 64.75 barrels and $97.12 for May 2, 1921, in the Wilrich estimates of appellant's interest in the total production and cash receipts from S and G leases, has not prejudiced appellant. Upon appellant's own showing, it has no cause to complain.

On the other hand appellant may justly complain of the adoption by the master of the Wilrich estimates of operating expenses, which, as we have seen, were incompetent to prove the expenses of the production, treatment, and sale of the oil produced, treated, and sold during the infringing period. Using the Wilrich estimates, the master found that the expenses, including the state production tax, amounted to $42,843.02. According to appellant's account, as stated by its accountant, these expenses, including the state production tax, amounted to $50,988.61. The credit for operating expenses allowed by the master, according to the statement prepared by appellant's accountant from the books, is too small by $8,145.59. But at the hearing before the master appellant called its auditor,

Easton, and proved by him (without producing the books) that the operating expenses during the infringing period, including the state production tax, amounted to—

$17,919.23 for S lease,
24,762.29 for G lease,
4,771.62 for J lease,

—a total of $47,453.14, which is in excess of the amount allowed by the master based upon the Wilrich estimates by $4,610.12. It is evident that, if the expenses as estimated by Wilrich and allowed by the master had chanced to be the same or in excess of the expenses as shown by its auditor, appellant would have no just cause of complaint. In addition to the operating expenses above mentioned, appellant in its belated statement of the account claims the following credits: Depreciation on field investment, $23,914.74; depletion, $163,806.78; interest on investment, $17,650.25; supervision, general and administrative, $30,169.11; federal income tax, $1,528.29.

[10] Apparently appellant, at the time its auditor prepared his statement of operating expenses, did not consider the additional items contained in its later account to be properly allowable as credits; at least, these additional items were not included in the auditor's statement, nor was any evidence introduced at the hearing before the master tending to show that there were any general and administrative expenses, some part of which might be justly chargeable in the account of operating expenses, nor was there any evidence introduced that a federal tax of $1,528.29, or of any amount, had been paid on account of the profits or income derived from the operation of the three leases during the infringing period. Having failed to have its auditor include these items in the account, and having failed to offer any proof of their existence by any other witness at the hearing before the master, it may not now say the master erred in not allowing them, or complain that it was not permitted to open the case and prove their existence after the case had been submitted to and decided by the master.

The evidence taken at the hearings before the master with respect to depreciation of field equipment is meager. The auditor, Easton, did not include such an item in his statement of operating expenses, nor did any witness attempt to state in detail what the equipment consisted of or its original cost; nor did any witness testify as to the original cost of any of the equipment used during the infringing period, or why or to what extent it had depreciated in value, except in respect to

tanks, and as to these the testimony is too unsatisfactory to justify this court in setting aside the finding of the master and trial court disallowing any credit for depreciation, even though it be assumed that an allowance for depreciation of tanks would have been approved by this court, had it been made.

[11] A credit on account of depletion of the oil reserves on the leases was properly disallowed by the master. In the first place, the evidence before the master was insufficient to furnish any basis for determining such a credit. But, aside from this, however proper and necessary it may be to take into consideration the depletion of oil reserves in determining the financial condition of appellant's business, it has no place in the account stated by the master. The argument for such an allowance begs the primary question at issue. It assumes that the oil taken from the earth during the infringing period had some value. The master found otherwise. He found that the oil produced and treated during the infringing period was valueless without treatment by plaintiff's process. The depletion of valuable oil reserves, therefore, was not a fact for the master's consideration when making up the account. The question was what profit appellant had made by converting roily oil—of no value either below or above ground—into a valuable and marketable product by the use of plaintiff's process. It is manifest that no credit could be allowed on account of the depletion of a worthless product.

[12] The weight of authority at the present time in infringement cases favors the allowance of interest on capital which it was necessary to invest in order to make the profits to be accounted for, where the plant in which the capital is invested is devoted wholly to the production of the infringing article, and in other cases where an apportionment can be made with reasonable certainty. Seabury v. Am Ende, 152 U. S. 561, 14 S. Ct. 683, 38 L. Ed. 553; Western Glass Co. v. Schmertz Wire Glass Co. (C. C. A.) 226 F. 730; Coffield Motor Washer Co. v. Wayne Mfg. Co. (C. C. A.) 255 F. 558; Philadelphia R. W'ks Co. v. U. S. Rubber Reclaim W'ks (C. C. A.) 277 F. 171; Computing Scales Co. v. Toledo Computing Scale Co. (C. C. A.) 279 F. 648. The rule established by these decisions is, we think, equitable and just. The lease with the equipment constituted appellant's plant or plants, operated solely, as we shall see hereafter, for the production of the oil treated by plaintiff's process. Under these conditions it would be equitable to allow interest upon the investment.

The witness Easton testified that the books showed expenditures upon the three leases in question during the infringing period as follows:

For drilling and equipment—

| | |
|---|---|
| On S lease | $ 18,294.41 |
| On G lease | 121,927.00 |
| On J lease | 5,623.77 |
| As purchase price— | |
| Of G lease | 15,000.00 |
| Total | $160,845.18 |

In appellant's belated account the interest on capital invested in the three leases at 5 per cent. per annum for 22 months (the period of infringement) is stated as $17,650.25. Accepting 5 per cent. as a fair rate, the interest on $160,845.18 for 22 months amounts to $14,744.21.

[13] But appellant claims that 42,476 barrels of oil produced on G and S leases during the infringing period were good oil and never treated by plaintiff's process. This contention may be disposed of in connection with this interest item. If the contention is sustained, the capital investment must be apportioned, and the interest allowance reduced accordingly. There was testimony introduced by plaintiff to the effect that all the oil produced on G lease prior to June 12, 1920, was good oil, and the witness Steele stated that the books showed the amount to be 26,000 barrels. The witness Meredith stated that the exact production prior to June 12, 1920, as shown by the records, was 26,005 barrels. The witness Steele also testified the records showed that 16,471 barrels produced on S lease during the infringing period was good oil, and not treated by plaintiff's process. All this testimony was objected to by plaintiff, among others, on the ground that appellant ought not to be permitted to prove that any of the oil produced by it on these leases during the infringing period was not roily oil and treated before sale, in view of its answers to the queries submitted by the master.

As we have seen, appellant had stated in its answers that it was impossible to segregate the treated and untreated oil, for the reason that the two had been mixed and no separate account of either had been kept. These answers were sworn to by the vice president (at the time of the trial the president of the company). If the testimony of the witnesses Steele and Meredith is true, the answer to the master's query is untrue. Appellant at no

time asked leave to withdraw or correct the answers made by it and sworn to by its officer and agent. Under the circumstances, the master and trial court did not err in disregarding the testimony of these witnesses as to the quantity of untreated oil produced on S and G leases during the infringing period. It was the duty of appellant to answer truthfully the questions propounded to it by the master, and, having failed to do so, it could not later stultify itself by proving its answers untrue. Railway Co. v. McCarthy, 96 U. S. 258, 24 L. Ed. 693. To hold otherwise would place a premium on falsehood and chicanery, bring courts of justice into disrepute, and render them contemptible in the eyes of honest men.

[14] Returning to the interest item: We find that the witness Easton did not give the dates of the expenditures of the capital invested in drilling and equipment on the three leases or in the purchase of G lease. * It is clear from the record that the total of $160,-845.18 was not invested on the first day of the infringing period. Appellant could have made this matter certain; but, having neglected to do so, plaintiff must be given the benefit of all doubts as to the times when the expenditures were made. We are satisfied from the evidence in the record that the investment of the total capital will average at least one-half of the infringing period.

[15] In our opinion the master should have allowed a credit of $7,372.10 on account of interest on capital investment. It is also our opinion that the master should have accepted the expense account as testified to by appellant's auditor, Easton, amounting to $47,453.-14, rather than have used the Wilrich estimates, by which he determined the expenses to be $42,843.02. True, the books or other written data of appellant were not offered or introduced in evidence in connection with the testimony of the witnesses; but plaintiff may not complain. He introduced no competent evidence of the amount of the expenses, and that amount may be determined now from the evidence put in the record by appellant, which, whether competent or not, amounts to admissions against interest.

The two items above mentioned, with interest thereon from the date of the report to the date of the judgment entered in the court below, amount to $13,226.32. The decree of the court below entered May 2, 1921, is affirmed. The judgment on the accounting entered on February 16, 1925, will be modified, by deducting the sum of $13,226.32 therefrom, and, as modified, affirmed.